310 F.2d 817
 UNITED STATES of America, Appellee.
v.
Vito AGUECI, Filippo Cottone, Robert Guippone, Luigi Lo Bue, Matthew Palmieri, Anthony Porcelli, Charles Shiffman, Rocco Scopellitti, Charles Tandler and Joseph Valachi, Defendants-Appellants.
 No. 99.
 Docket 27466.
 United States Court of Appeals Second Circuit.
 Argued October 4, 1962.
 Decided November 8, 1962.
 
 COPYRIGHT MATERIAL OMITTED Julian C. Tepper, Brooklyn, for Vito Agueci, appellant.
 Jerome Lewis, New York City (Theodore Krieger, New York City, on the brief), for Filippo Cottone, appellant.
 Lawrence A. Kobrin, New York City, for Rocco Scopellitti, appellant.
 Menahem Stim, New York City, for Joseph Valachi, appellant.
 Frances Kahn, New York City, for Luigi Lo Bue, appellant.
 Albert J. Krieger, New York City, for Charles Shiffman and Charles Tandler, appellants.
 Theodore Krieger, New York City, for Robert Guippone, Anthony Porcelli and Matthew Palmieri, appellants.
 T. F. Gilroy Daly, Asst. U. S. Atty., Southern District of New York, New York City (Vincent L. Broderick, U. S. Atty., Sheldon H. Elsen, Arnold N. Enker, Michael F. Armstrong, Peter K. Leisure, Asst. U. S. Attys., on the brief), for appellee.
 Before LUMBARD, Chief Judge, and FRIENDLY and KAUFMAN, Circuit Judges.
 KAUFMAN, Circuit Judge.
 
 
 1
 The ten defendants before us appeal their convictions for violation of the federal narcotics laws, 21 U.S.C. §§ 173, 174. The defendants were sentenced to imprisonment for periods ranging from five years to twenty-five years,[1] after a two-month trial before a jury in the Southern District of New York. The indictment, filed on May 22, 1961, contained thirty counts. The first count charged all of the appellants and several others with conspiracy to violate the narcotics laws, commencing in September 1958 and continuing until May 1961; counts two through thirty separately charged various defendants with substantive violations. Several individuals were named in the indictment as coconspirators but not as defendants[2] and other coconspirators named as defendants were not tried below for various reasons.[3] Michael Maiello was also convicted but died while his appeal was pending.
 
 
 2
 At the trial, the Government's case depended principally upon the testimony of two witnesses, Salvatore Rinaldo and Matteo Palmeri, who had not been named as defendants in the indictment but had been charged with participation in the conspiracy. Their testimony was offered to establish that the appellants and numerous other persons had engaged in a single conspiracy to import from Italy large quantities of heroin, which they adulterated, packaged, distributed, and sold in the United States. The conspiracy, defined generally, involved the importation of narcotics into this country by concealed packages hidden in valises or false-bottom trunks, most of which were unwittingly brought to New York piers by Italian immigrants. These immigrants were requested to bring the trunks and valises to this country by a travel agent in Italy, purportedly as a favor to some friends here. Whenever this method proved for some reason unsatisfactory, one of the appellants would travel abroad in order personally to assure the success of the venture. For convenience, we may refer to the small body of coconspirators who initated the various importations and the subsequent distributions and sales of the narcotics as the "executive group." The Government's witnesses established that the members of this group were Albert Agueci,[4] Frank Caruso, Vincent Mauro, and John Papalia, none of whom are appellants, and Vito Agueci, Luigi Lo Bue, and Joseph Valachi, appellants here. In addition to these men, appellant Rocco Scopellitti was also implicated in the importation scheme, for he was alleged to have personally imported heroin into this country in August 1960.
 
 
 3
 Upon ascertaining the precise dates of the arrival in New York of the narcotics being imported, one of the members of the executive group would contact Matteo Palmeri, the Government witness, who ran a bakery in Brooklyn.[5] Palmeri, using his bakery truck, would drive to Pier 84 in Manhattan, seek out the immigrant who was bringing the trunk or valise containing the narcotics and identify himself as a friend of the Italian travel agent, and return with the trunk or valise to his bakery. On one occasion, when Palmeri's truck was out of order, he enlisted the aid of appellant Filippo Cottone. Palmeri was often assisted by Salvatore Rinaldo, the other chief witness for the Government. Rinaldo would perform a test on the white powder contained in the hidden packages to assure that it was heroin. The packages of narcotics were at first hidden in Palmeri's bakery, and later in Rinaldo's home in Mount Vernon.
 
 
 4
 Until October 21, 1960, when they were arrested, Palmeri and Rinaldo were the primary distributing agents for the conspiracy. They would be contacted by one of the members of the executive group and instructed to deliver a specified quantity of narcotics to a specified individual at a specified time. Thus, in the month of July 1959, Caruso told Rinaldo to meet with appellant Matthew Palmieri in order to consummate a sale. In December 1959, Valachi introduced appellant Anthony Porcelli to Rinaldo for a like purpose, and in April 1960, Porcelli introduced Rinaldo to another appellant, Ralph Guippone. The three coconspirators — Rinaldo, Porcelli, and Guippone — would adulterate the heroin in Rinaldo's home, sell the product to other individuals named in the indictment but not here on appeal, and share in the proceeds of the sale. In May of 1960, at a racetrack rendezvous, and at the instructions of Caruso, Rinaldo met with appellant Charles Shiffman who was later instrumental in arranging sales of narcotics from Rinaldo to appellant Charles Tandler.
 
 
 5
 This, in skeleton outline, is the manner in which the alleged conspiracy operated and the manner in which each of the appellants was implicated. This information will be helpful in giving form to the narrative of specific events, which follows.
 
 
 6
 The indictment charges a continuing conspiracy from September 1958 until the date of its filing, May 22, 1961. The testimony of Government witnesses Palmeri and Rinaldo establishes the sequence of events through October 21, 1960, when both were arrested. In October of 1958, Matteo Palmeri met Albert Agueci, one of the members of the executive group, in Brooklyn; in response to questioning Palmeri indicated that he would be interested in participating in a plan to smuggle diamonds. The following month, appellant Luigi LoBue appeared at Palmeri's bakery in Brooklyn, and he informed Palmeri that he was aware of his interest in diamond smuggling, which information had been conveyed by Albert Agueci. In May of 1959, LoBue again contacted Palmeri, telling him to go to Pier 84 in order to pick up a valise from a named passenger and to identify himself (Palmeri) as a friend of Salvatore Valenti, the Italian travel agent who was allegedly responsible for "planting" the valises with Italian immigrants. Palmeri did so and delivered the valise into LoBue's hands at the bakery. Some days later, LoBue returned to the bakery with five packages which he gave to Palmeri to be hidden. Soon after, Palmeri brought those packages, on LoBue's instructions, to Vincent Mauro, who, along with LoBue, is alleged to have been a member of the executive group. Mauro, over the course of a few days, paid $15,000. to Palmeri, who in turn passed the money on to LoBue; Palmeri was rewarded for his efforts with $300.
 
 
 7
 In July 1959, LoBue told Palmeri that he had received a letter from Italy and that Palmeri should report to the pier and meet the passenger named in the letter, procure the valise, and return to the bakery. Palmeri did so, and upon observing LoBue remove a blanket from the valise, cut it open and withdraw packages of white powder, Palmeri was told by LoBue that they were dealing not in diamonds but in narcotics. Again, Palmeri was requested to hide the packages, and he again made another sale at Mauro's direction, receiving $15,000. That month, Palmeri was introduced to Salvator Rinaldo, the other chief Government witness, and from that time Palmeri delivered heroin to Rinaldo, in order to facilitate the latter's sales. The first such sale was from Rinaldo to defendant Matthew Palmieri, in exchange for $8500., which money Rinaldo transmitted to Caruso. This incident occurred in July 1959. Another sale on precisely the same terms was carried out between Rinaldo and appellant Palmieri on March 21, 1960.
 
 
 8
 Rinaldo's position as central distributor became even more secure when, in December 1959, Mauro, of the executive group, told appellant Valachi, another member of that group, that narcotics were to be picked up from Rinaldo. Valachi met with Rinaldo that month, and introduced him to appellant Anthony Porcelli; Valachi said that Porcelli was working for him and that it would be Porcelli who would pick up narcotics from Rinaldo in the future. The next morning, with Valachi standing nearby, Rinaldo delivered a package of heroin to Porcelli, which was paid for over the course of two or three weeks. Rinaldo turned over the proceeds of the sale to Caruso. In January of 1960, Rinaldo was introduced to two additional contacts[6] to whom further sales were made.
 
 
 9
 In late January, LoBue notified Palmeri, the baker, that a third shipment of narcotics was arriving in a valise carried by a named Italian immigrant on March 7, 1960. Palmeri performed his usual function, retrieved the valise with the hidden packages of narcotics, and passed these on to Rinaldo, who tested a sample of the substance from each of the packages. He found it to be heroin. Soon thereafter, on March 19, Rinaldo met with appellant Valachi, who informed him that "he was going away", and that in his absence, Rinaldo should deal with appellant Porcelli and with one Michael Maiello. Valachi said that although he was going away, Porcelli and Maiello would be taking care of him and sharing with him any profits these two would make on the sale of narcotics. It turned out that Valachi was indeed "going away" soon, for nine days later he surrendered to federal authorities on another charge and was incarcerated in prison.
 
 
 10
 Losing little time, Porcelli went to Rinaldo's home in Mount Vernon, in April 1960, and introduced appellant Robert Guippone; he said that Guippone was one of the men who was carrying on in Valachi's interest while Valachi was imprisoned. Plans were made to dilute quantities of heroin with milk sugar, to sell them, and share the profits. The dilution and sales were made on several occasions in the months of May, June, August, and September 1960, and Rinaldo, Porcelli, and Guippone shared in the handsome profits, with some of the money going, on at least one occasion, to Caruso. These transactions represent the eleven substantive counts on which both Porcelli and Guippone were convicted.
 
 
 11
 At approximately the same time that Guippone and Porcelli first met with Rinaldo in April 1960, a meeting of several members of the executive group took place at a Manhattan restaurant. They there decided that future narcotic importations would be in trunks with false bottoms rather than in valises. That month, appellant Vito Agueci went to Italy, for what he claimed was a visit to his aged parents. The Government, of course, places a different interpretation on the facts and points out that this was not the only purpose to be reasonably inferred from this trip, for proof was introduced that in May of that year, Vito Agueci wrote a letter from Italy to Palmeri, telling him that a trunk and a valise would be brought into this country on June 2, 1960, and that Palmeri should be there to pick them up. Rinaldo accompanied Palmeri to the pier at that time; he later tested the packages secreted in the trunk and valise and found them to contain heroin, weighing fifteen kilograms.
 
 
 12
 Notification of the next shipment came quickly upon the heels of the June 2 importation. In July, Palmeri received a letter from Salvatore Valenti, the Italian "travel agent", informing him that appellant Rocco Scopellitti was to arrive from Italy on August 10. On that morning, Palmeri was contacted by Albert Agueci, appellant's brother and member of the executive group, who told him that Scopellitti worked for him and was to be fully trusted. At the pier, Scopellitti and Palmeri loaded the trunk into Palmeri's truck and drove back to the bakery. En route, Palmeri asked Scopellitti when he was returning to Italy and Scopellitti replied that he would go whenever Albert Agueci wanted him to pick up another trunk. When they reached the bakery, they were greeted by Rinaldo, who had earlier been instructed by two members of the executive group that he was no longer to acccompany Palmeri to Pier 84 but was to wait for him at the bakery. Palmeri introduced Scopellitti, telling Rinaldo that Scopellitti was "all right", and that he had made the trip from Italy with the trunk; Scopellitti, to dispel any further doubt, said "Don't worry. I know what it's all about." The three proceeded to rip open the false bottom of the trunk which revealed packages of heroin.[7] Rinaldo took the packages to his home; he tested them and found them to contain heroin.
 
 
 13
 While these two shipments of June and August 1960 were being planned and consummated, Rinaldo was making further sales at the behest of the executive group. In late May, Caruso told him to meet with appellant Charles Shiffman at the Roosevelt Raceway, which Rinaldo did. A night or two later, Rinaldo was introduced to appellant Charles Tandler. It was there agreed that Shiffman would transmit certain code phone calls to Rinaldo, whereupon Rinaldo would meet with Tandler at an appointed rendezvous for the purpose of selling him narcotics. Pursuant to this plan, Rinaldo delivered three kilograms of heroin to Tandler shortly after this meeting at the racetrack. Three kilograms were again delivered to Tandler on August 13 and four more in early October. On October 10, Shiffman and an associate paid Rinaldo $25,200 for the last sale to Tandler, and Rinaldo turned the money over to Caruso.
 
 
 14
 The fifth shipment of narcotics was again preceded by a letter from Italy, informing Palmeri that a trunk would arrive on September 2. Palmeri drove to Pier 84 but was unable to claim the trunk because he could not find the immigrant who had shepherded it from Italy. After some frantic phone calls and some impatient days of waiting, it was finally learned that the claim check and the keys to the trunk could be found at a given address in Garfield, New Jersey. Palmeri procured the check and the keys, and was prepared to set out for the pier when he found that his truck was not in working order. Albert Agueci previously had informed Palmeri that in case of such difficulties he should contact Filippo Cottone, one of the appellants. Palmeri did so and told Cottone that he needed his help to get down to the pier to pick up a trunk containing narcotics; he promised Cottone $300 for his services. En route from the pier back to the bakery, Cottone was critical of Palmeri and his associates for the mishandling of the pickup of the trunk. "I can't understand * * * how you people do things, it is ridiculous"; he added that there had been no trouble with the other shipments. At the bakery, where Rinaldo was again waiting, Cottone was introduced by Palmeri, who endorsed him as being "all right". The three ripped open the trunk's false bottom, which contained ten packages of heroin. Cottone took away one of the blankets in which three kilograms of heroin were concealed but which Palmeri had overlooked; these were soon retrieved by Palmeri. Rinaldo again tested samples and found heroin.
 
 
 15
 Vito Agueci, during the month of September 1960, took a second trip to Italy. From there, he notified Palmeri that another shipment was due October 21st, and Palmeri in turn notified Rinaldo. Rinaldo relayed the message to Porcelli in a conversation with him in Mount Vernon. Shortly before the narcotics were to arrive, Caruso of the executive group informed Rinaldo that the woman who ran Palmeri's bakery was growing suspicious; all future imported trunks were therefore to be taken directly from the pier to Rinaldo's house. Palmeri was informed of the new routine, and on October 21 both he and Rinaldo went to Pier 84 and picked up what was to be the last shipment of narcotics. It was en route to Rinaldo's home in Mount Vernon that both men were arrested by Westchester County police and federal narcotics agents. The trunk they were transporting was found to contain ten kilograms of what was determined by United States Government chemists to be heroin.
 
 I.
 
 16
 We shall first consider those contentions raised by the appellants which affect all or several of them; we shall then proceed to discuss those contentions specifically raised on behalf of particular defendants.
 
 THE CONSPIRACY INSTRUCTION
 
 17
 The appellants challenge the propriety of the trial court's instructions regarding the scienter necessary to a finding of conspiracy to violate the federal narcotics law, specifically, 21 U.S.C. § 174. Even assuming that defendants may be heard to complain despite their failure to call the alleged error to the judge's attention, see Screws v. United States, 325 U.S. 91, 107, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945); United States v. Atkinson, 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555 (1936); United States v. Massiah, 307 F.2d 62 (2d Cir., 1962), we hold that Judge Herlands adequately covered in his charge all the elements necessary to warrant a finding of guilt for participation in a narcotics conspiracy. He charged as follows:
 
 
 18
 "Count 1 of the indictment charges that each of the defendants on trial conspired to violate the Federal Narcotic Laws. In order to convict under the first count of the indictment, you would have to find:
 
 
 19
 "First: that sometime between September 1, 1958 and May 22, 1961, in the Southern District of New York, a conspiracy to violate the narcotic laws existed between any one of the defendants on trial and any other defendant, either on trial or not on trial, or any co-conspirator named in the indictment.
 
 
 20
 "Second: you would have to find that it was part of this conspiracy to do any one of the following:
 
 
 21
 "a. Unlawfully import and bring large amounts of narcotic drugs into the United States from Italy; or "b. To receive, conceal, buy, sell and facilitate the transportation, concealment and sale of large amounts of narcotic drugs after they had been imported and brought into the United States, knowing that the said narcotic drugs had been brought into the United States illegally; or
 
 
 22
 "c. To dilute, mix and adulterate large quantities of the said narcotic drugs prior to distribution.
 
 
 23
 "Third: In addition to your finding that there was a conspiracy, and that it was part of the conspiracy to do one of these three things just enumerated, you would have to find that at least one of the 14 overt acts charged in the indictment was actually committed * * *.
 
 
 24
 "The fourth and final element you would have to find as to each of the defendants is that he knowingly became a member of the conspiracy." (Emphasis added.)
 
 
 25
 This instruction made it plain beyond challenge that the crime charged was a conspiracy to violate the narcotics law and that requisite to a finding of such violation is knowing participation in a scheme having as an objective the importation of narcotics contrary to law, or the knowing transportation or facilitation of sales of narcotics after they have been knowingly brought into the country illegally, or the knowing adulteration of those very narcotics. It is thus clear that United States v. Massiah, 307 F.2d 62 (1962), recently decided by this Court (Chief Judge Lumbard dissenting) — even assuming its correctness — is not in point. The fatal error in the judge's instruction in Massiah was his failure "at any point in his charge on the conspiracy count to instruct the jury that knowledge of illegal importation was a necessary element of the conspiracy" to violate the narcotic laws. 307 F.2d 70. (Italics in the original). There the trial judge devoted his instructions to those elements common to all criminal conspiracies rather than focussing on the narcotics aspect of the conspiracy; the latter would have required that the jury find the defendants to have had knowledge that the narcotics had been or were to be unlawfully imported.
 
 
 26
 Not only did the trial judge in Massiah fail affirmatively to instruct the jury on the element of knowledge, but it was determined on appeal that certain passages in the court's discussion of the general law of conspiracy actually "suggested to the jury that knowledge of importation was not necessary * * *" (307 F.2d at 70). The majority of the Court cited this passage from the charge: "One may become a member of a conspiracy without full knowledge of all the details of the conspiracy or of all of the conspirators." Appellants point to a similar passage in Judge Herlands' charge, but even in that passage, there is an important difference in emphasis. He stated: "It is not necessary that one be fully informed as to the details of the scope of the conspiracy in order to justify an inference of knowledge on his part." (Emphasis added.) This instruction pointedly emphasized the need to find that the defendants charged with conspiracy had knowledge of the general illicit purposes of importation, transportation, or adulteration; it cautioned the jury that omniscience regarding every aspect of the conspiracy was not indispensable to a finding of such knowledge but that legitimate and reasonable inferences of such knowledge could be drawn. This is an unchallenged maxim of criminal law. We recently held in United States v. Aviles, 274 F.2d 179, 188 (2d Cir.), cert. denied, 362 U.S. 974, 80 S.Ct. 1057, 4 L.Ed.2d 1009 (1960), that individuals who purchased narcotics from one of the conspirators were themselves participants in the conspiracy if "it is clear that they knew the nature of the operation. Whether they knew its full extent and all of its activities and actors is immaterial." See United States v. Rich, 262 F.2d 415, 418 (2d Cir., 1959).
 
 
 27
 Upon a reading of the whole charge, see Carey v. United States, 111 U.S.App. D.C. 300, 296 F.2d 422, 426 (1961), Gilmore v. United States, 256 F.2d 565 (5th Cir., 1958), we are convinced that the jury had constantly before it the judge's admonition that the elements set down in 21 U.S.C. § 174, among them knowledge of the illegal importation, were indispensable to a finding of guilt on the conspiracy count.
 
 EVIDENCE OF A SINGLE OVERALL CONSPIRACY
 
 28
 Several appellants contend that, although the indictment charged a single continuing conspiracy from late in 1958 until the time of the filing of the indictment, there was proof of several separate and independent conspiracies. The variance in proof is deemed by these appellants to be of such a serious and prejudicial nature that reversal is required. See Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); United States v. Russano, 257 F.2d 712 (2d Cir., 1958). We find that there was ample proof to warrant the finding of a single continuing conspiracy.
 
 
 29
 The Government's evidence successfully assimilates the conspiracy before us to the model of the so-called "chain" conspiracy, so familiar in other narcotic cases. See Blumenthal v. United States, 332 U.S. 539, 68 S.Ct. 248, 92 L. Ed. 154 (1947); United States v. Aviles, 274 F.2d 179 (2d Cir.), cert. denied, 362 U.S. 974, 80 S.Ct. 1057, 4 L.Ed.2d 1009 (1960); United States v. Stromberg, 268 F.2d 256 (2d Cir.), cert. denied, 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959); United States v. Rich, 262 F.2d 415 (2d Cir., 1959). The "chain" conspiracy has as its ultimate purpose the placing of the forbidden commodity into the hands of the ultimate purchaser. See Note, "Federal Treatment of Multiple Conspiracies," 57 Colum.L.Rev. 387, 390 (1957). That form of conspiracy is dictated by a division of labor at the various functional levels — exportation of the drug from Europe and importation into the United States, adulteration and packaging, distribution to reliable sellers, and ultimately the sale to the narcotics user. Here the members of the executive group — among them, appellants Vito Agueci, Luigi LoBue, and Joseph Valachi — formed the core of conspirators. They arranged for the exportation of large quantities of narcotics from Italy, for their importation into this country, and for their safe delivery from the New York piers for ultimate distribution by Palmeri into the hands of Rinaldo who would arrange for sales in successive transactions. Scopellitti and Cottone were participants, each on one occasion, in this process. Rinaldo was shown to be the central distributor, the key "link" in the "chain", and from him the distribution and sale links — composed of Porcelli, Guippone, Palmieri, Shiffman, and Tandler — carried the narcotics to the ultimate purchaser.
 
 
 30
 Guippone and Porcelli contend that the evidence against them reveals, at best, a separate enterprise between them and Rinaldo, devoted to the adulteration and sale of narcotics quite independent of the conduct of the other members of the conspiracy. The answer to this is that the mere fact that certain members of the conspiracy deal recurrently with only one or two others does not exclude a finding that they were bound together in one conspiracy. Here, there was ample proof that both Porcelli and Guippone were left to carry on the interests of appellant Valachi while the latter was in prison. Valachi had indeed introduced appellant Porcelli to Rinaldo and stood nearby when a sale was consummated between the two. Both Porcelli and Guippone had to be aware, by the nature of the enterprise, that Rinaldo was constantly being supplied with new quantities of narcotics; their repeated adulterations of the narcotics over a period of several months, their expressed intention to carry on the interests of Valachi, one of the members of the executive group, their splitting of the profits of their sales on at least one occasion with Caruso, another member of the executive group, readily support that conclusion. Knowing of these outside sources, it was enough to make Porcelli and Guippone members of the overall conspiracy that the success of their "independent" venture was wholly dependent upon the success of the entire "chain". United States v. Bruno, 105 F.2d 921 (2d Cir.), rev'd on other grounds, 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257 (1939); see United States v. Aviles, 274 F.2d at 188. An individual associating himself with a "chain" conspiracy knows that it has a "scope" and that for its success it requires an organization wider than may be disclosed by his personal participation. Merely because the Government in this case did not show that each defendant knew each and every conspirator and every step taken by them did not place the complaining appellants outside the scope of the single conspiracy. Each defendant might be found to have contributed to the success of the overall conspiracy, notwithstanding that he operated on only one level. See United States v. Stromberg, supra.
 
 
 31
 The nature of the enterprise determines whether the inference of knowledge of the existence of others in one overall conspiracy is justified. It is clear that in a narcotic conspiracy case of this nature no one member of the group can by himself insure the success of the venture; he must know that combined efforts are required. See United States v. Bruno, supra, 105 F.2d at 922. "[T]he conspirators at one end of the chain knew that the unlawful business would not, and could not, stop with their buyers; and those at the other end knew that it had not begun with their sellers." In Bruno, narcotics were smuggled into New York and ultimately sold in Texas and Louisiana as well as in New York. Four groups were involved — the smugglers, the middlemen, and two groups of retailers. The importers could not profitably stay in business without a selling outlet and the reverse was true, for the retailers required a continuing source of supply. Comparison of the facts in Bruno with those in the oft-cited case of United States v. Peoni, 100 F.2d 401 (2d Cir., 1938), relied on by appellants, shows the inappositeness of the latter. In Bruno the evidence sufficed to warrant the jury's finding that defendants knew remote links must have existed; in Peoni it did not. Had the prosecution in Peoni been able to establish more than one sale from Peoni to Regno, the inference that Peoni knew that sales beyond his own would be made, and that he thus shared a common purpose with Dorsey as Regno's vendee, might well have been strong enough to warrant submission to the jury. Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), where the success of any individual illegal transaction was independent of the success of any other, is sufficiently distinguishable. Kotteakos is usually given as the prime example of the so-called "circle" or "wheel" conspiracy, which is not what we are dealing with here. See Note, 57 Colum.L.Rev. 387, 388-389 (1957).
 
 
 32
 In any event, the test for reversible error, if two conspiracies have been established instead of one, is whether the variance affects substantial rights. Fed.R.Crim.P. 52(a). The material inquiry is not the existence but the prejudicial effect of the variance. While we believe, as we have already stated, that the jury could find there was but one conspiracy, the finding of more than one conspiracy would not result in prejudice to any of the defendants in the case before us. See Berger v. United States, 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). The requirements for sustaining a verdict in which there has been a variance have been met. The several conspiracies, if there had been such, could have been joined in a single indictment or consolidated for a single trial and the conduct of the trial was such that the danger resulting from the admission of evidence not chargeable to any appellant was minimal. See Blumenthal v. United States, 332 U.S. 539, 559-560, 68 S.Ct. 248, 92 L.Ed. 154 (1947); Hanis v. United States, 246 F.2d 781, 789 (8th Cir., 1957); Ritter v. United States, 230 F.2d 324, 328-329 (10th Cir., 1956); United States v. Antonelli Fireworks Co., 155 F.2d 631, 635 (2d Cir.), cert. denied, 329 U.S. 742, 67 S.Ct. 49, 91 L.Ed. 640 (1946); Note, "Developments in the Law of Criminal Conspiracy," 72 Harv.L.Rev. 920, 992 (1959). Again Kotteakos, where the prosecution of thirty-two defendants resulted in proof of at least eight separate conspiracies, is inapplicable.
 
 
 33
 Appellant Palmieri contends that there was insufficient evidence to support his conviction on the conspiracy count. Since we find that his conviction on substantive count 5 of the indictment, for a sale of narcotics on March 21, 1960, was sufficiently supported by the evidence, any discussion of his conspiracy conviction is rendered moot; Judge Herlands imposed concurrent sentences on each count. See Sinclair v. United States, 279 U.S. 263, 299, 49 S.Ct. 268, 73 L.Ed. 692 (1929); United States v. Mont, 306 F.2d 412, 414 (2d Cir., 1962).
 
 
 34
 EVIDENCE OF NARCOTICS IN THE SUBSTANTIVE COUNTS
 
 
 35
 It is not necessary, in order for the Government to prove its case of conspiracy to violate the narcotic laws, that there be proof of actual dealings in narcotics. All that need be proved is the unlawful agreement and an overt act committed in pursuance of the agreement. The "conspiracy is a crime in and of itself, separate and apart from the crime of importation, purchase, sale, and transportation of narcotics." Poliafico v. United States, 237 F.2d 97, 105 (6th Cir., 1956), cert. denied, 352 U.S. 1025, 77 S.Ct. 590, 1 L.Ed.2d 597 (1957). Cf. Braverman v. United States, 317 U.S. 49, 54, 63 S.Ct. 99, 87 L.Ed. 23 (1942); Pereira v. United States, 347 U.S. 1, 11, 74 S.Ct. 358, 98 L.Ed. 435 (1954). The rule is otherwise, however, with regard to substantive violations of the narcotics laws; there, the jury must be convinced beyond a reasonable doubt that the substance imported sold, concealed, or adulterated was in fact a narcotic drug. This element, under the terms of 21 U.S.C. § 174, is requisite to a conviction. But it is not necessary that it be proved by direct evidence. Just as with any other component of the crime, the existence of and dealing with narcotics may be proved by circumstantial evidence; there need be no sample placed before the jury, nor need there be testimony by qualified chemists as long as the evidence furnished ground for inferring that the material in question was narcotics. See United States v. Morello, 250 F.2d 631, 633-634 (2d Cir., 1957).
 
 
 36
 The appellants who have been convicted on substantive counts do not challenge these principles of law. They contend, instead, that the trial judge did not adequately compartmentalize the circumstantial evidence as it was relevant to the proof of narcotics in a particular substantive count charged against a particular defendant. It is contended that the jury was, in essence, instructed that in determining the guilt of one defendant under a substantive count of the indictment, they should weigh evidence relating to other substantive counts, to other defendants, and to transactions in which the particular defendant was not even involved. The judge's instruction is therefore contended to violate the principle laid down in United States v. Bufalino, 285 F.2d 408 (2d Cir., 1960), that proof in a mass conspiracy trial must be individualized and compartmentalized, defendant by defendant and count by count. Evidence admissible to prove only the conspiracy was, it is argued, improperly employed to prove the individual substantive counts.
 
 
 37
 We hold that Judge Herlands' instructions on the use of circumstantial evidence to determine that the material in question was narcotics in the various substantive counts were adequate. He charged that there were seven categories of circumstantial evidence which the jury might consider in determining whether a given defendant had possession of or had imported the narcotic drug as charged in each substantive count: (1) Rinaldo's testimony that he had personally tested samples of the powder from each shipment; (2) the secrecy and deviousness with which the transactions were handled (i. e., false-bottomed trunks, use of linings in the blankets, code words, etc.); (3) the fact that the substance in which they were dealing was a white powder; (4) the high prices paid in cash for the substance; (5) the lack of complaint on the part of the purchasers; (6) descriptive language used by certain of the defendants in connection with certain transactions; (7) the white powder in evidence which the United States chemist testified was heroin hydrochloride. A conviction on similar evidence was upheld in Toliver v. United States, 224 F.2d 742, 745 (9th Cir., 1955).
 
 
 38
 In a trial of this dimension, each juror is faced with a difficult task in compartmentalizing the evidence with regard to each particular defendant and keeping clearly in mind the full circumstances of each transaction. It is the function of the judge, in his instructions to the jurors, to marshal the evidence that they have seen and heard presented such that justice may be meted out to the individual rather than to the group. Our concept of criminal responsibility, like our concept of moral responsibility, is rooted in the individual, his intentions, his motives, and his conduct. The trial judge, therefore, has the burden of impressing upon the jury the need for judging each defendant separately upon each separate substantive count charged in the indictment. We feel that Judge Herlands patiently and capably performed this task. His instructions to the jury were replete with admonitions that "you must be convinced beyond a reasonable doubt that the substance involved in each of such substantive counts was a narcotic drug * * *."
 
 
 39
 That portion of the charge on circumstantial evidence of narcotics most likely to result in harmful side effects to the defendants was the following: "6. The Government claims that its witnesses, Palmeri and Rinaldo, testified as to admissions by certain of the defendants that they were dealing with narcotics in connection with certain transactions." (Emphasis added.) Even there, the emphasis upon particular defendants in particular transactions is strong. We feel that any possible ambiguity was cured by the passage almost immediately following: "If the evidence convinces you beyond a reasonable doubt that the substance involved in a particular count — and you must consider the evidence count by count — was heroin, you may conclude that this element of the offense charged in the particular count has been proved. If, on the other hand, the evidence does not convince you beyond a reasonable doubt that the substance involved in a particular count was heroin, you must find the defendant or defendants named in the particular count not guilty on that particular count."[8] Reading the charge in its entirety and observing the emphasis which the trial judge placed on the necessary requirements of proof, we cannot agree that the jury was not instructed on the need to compartmentalize the evidence and on the consideration it was to give to the evidence as it applied to each defendant on each substantive count.
 
 
 40
 The Government further argues that were we to construe Judge Herlands' charge as suggested by the appellants, there was no error, for anything said or done by a conspirator in furtherance of the conspiracy is admissible against every other conspirator, even on a substantive count. This principle of law, they argue, is operative despite the absence of a charge of conspiracy in the indictment. We are referred to Pinkerton v. United States, 328 U.S. 640, 645-648, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), and United States v. Pugliese, 153 F.2d 497 (2d Cir., 1945). The appellants reply that the application of principles of agency to the criminal law, see 4 Wigmore, Evidence § 1079 (3d ed. 1940), has been restricted to cases of actual aiding and abetting, to cases of present specific participation in the specific acts which make up the crime charged in the substantive offense; the principles are said not to extend to cases of broad-ranging conspiracy. Since we have held that Judge Herlands adequately compartmentalized the evidence with regard to the substantive offenses of the individual defendants, we are not required to determine whether each item of evidence could not properly be considered against each conspirator under the rule of law advanced by the Government.
 
 
 41
 Appellant's final attack upon the proof that the material was narcotics addresses itself to the sufficiency of the evidence on this phase of the case. We reject this argument, for we find the evidence introduced to establish that the material in question in the substantive counts was narcotics to be quite convincing. All the narcotics referred to in those counts went through the hands of Rinaldo, who testified that he tested a sample from each shipment, except the last, and found narcotics each time. The last shipment, as well as samples from some earlier shipments which Rinaldo had hidden in his home, were tested by United States Government chemists and found to be narcotics. The appellants contend that Rinaldo's tests — change of color upon the addition of nitric acid and liquification upon heating the powder to between 230°C and 240°C — were insufficient to prove that the substance was narcotics. They urge that other chemical tests must be performed before the substance can definitively be determined to be narcotics. But surely there was sufficient evidence, albeit not conclusive to a mathematical certainty, to warrant a reasonable inference to that effect. The Government need not exclude every remote possibility of innocence before its case warrants submission to the jury. See Holland v. United States, 348 U.S. 121, 139-140, 75 S.Ct. 127, 99 L.Ed. 150 (1954); United States v. Tutino, 269 F. 2d 488, 490 (2d Cir., 1959).
 
 
 42
 INSTRUCTIONS ON DEFENDANT'S PRIVILEGE NOT TO TESTIFY
 
 
 43
 Appellant Tandler did not take the stand during the course of the trial. Judge Herlands, in summarizing the defense theories and contentions offered on behalf of defendants Shiffman and Tandler, instructed the jury as follows:
 
 
 44
 "Now the defendant Shiffman took the stand. The defendant Tandler did not take the stand. The fact that the defendant Tandler did not take the stand does not give rise to any presumption or inference against him or adverse to him. As you know, under the Constitution, Fifth Amendment, no defendant in a criminal case can be compelled to be a witness against himself; and that means that in a criminal case a defendant has the prerogative and privilege not to testify, and the fact that he does not testify does not in any way, directly or indirectly, permit you to draw any inference adverse to the defendant. A defendant has the right to rely on his presumption of innocence and to put the Government to its proof."
 
 
 45
 At the conclusion of Judge Herlands' instructions, Tandler's attorney excepted to the language in this passage referring to the Fifth Amendment and to the privilege against self-incrimination. It is argued by Tandler, and by appellants Lo Bue, Palmeri, and Valachi, who also chose not to testify, that a reference to the Fifth Amendment, in an era when it is said resort to that amendment creates an indisputably unfavorable inference, was prejudicial and constituted reversible error. While most likely it would have been better if the judge had not mentioned the Fifth Amendment, his statement, in the context of the passage quoted above and also of the supplemental charge he later gave in response to an objection by Tandler's counsel, was not reversible error.
 
 
 46
 At common law, the accused in an ordinary criminal prosecution could not be called as a witness in his own behalf, because under the rules governing litigation until the middle of the last century, he was deemed "incompetent" to testify at all. This incapacity pre-existed the drafting of the Constitution and the Bill of Rights. The accused's incapacity to testify in a federal court was removed in 1878 by what is now Title 18 U.S.C. § 3481: "In trial of all persons charged with the commission of offenses against the United States * * * the person charged shall, at his own request, be a competent witness. His failure to make such request shall not create any presumption against him." It is therefore usually assumed that the constitutional provision, "though not at all necessary, when adopted, to guard the accused against being called, were intended to preserve that result of the incompetency from being abrogated by legislation." McCormick, Evidence, § 122 at 257 (1954). The outstanding authority on evidence likewise treats the constitutional privilege against self-incrimination as the modern-day foundation for the accused's privilege not to take the stand. See 8 Wigmore, Evidence, §§ 2251 at 296, 2268 at 406 (McNaughton Rev.1961). We believe therefore that it was factually proper for Judge Herlands to charge as he did regarding defendant Tandler's failure to take the stand.
 
 
 47
 Appellant Tandler has made an effort to distort the judge's instruction into an "unfavorable comment", calling to our attention several cases stating the rule that a conviction should be reversed if the court comments unfavorably on the failure of an accused to testify. Quercia v. United States, 289 U.S. 466, 471-472, 53 S.Ct. 698, 77 L.Ed. 1321 (1933); Allison v. United States, 160 U.S. 203, 209, 16 S.Ct. 252, 40 L.Ed. 395 (1895). We find these cases completely inapposite. It is patently contrived to argue that Judge Herlands was commenting unfavorably when in the very same passage to which objection is taken he charged twice that the jurors were forbidden to draw any adverse inferences; he also explained that the defendant has a right to rely on his presumption of innocence and to put the Government to its proof. In so doing, Judge Herlands' charge could be construed as even more favorable to Tandler than it was to the other coconspirators who likewise chose to rest upon their privilege not to testify.
 
 
 48
 Finally, in response to an exception by Tandler's counsel, Judge Herlands gave this supplemental instruction to the jury: "The legal theory for this rule is immaterial so far as you are concerned but the important and vital point for you as jurors in this case to bear in mind is that a defendant has the unqualified right not to take the stand, and you may not in any manner draw any inference against the defendant because he did not take the stand." We have held before that a clear instruction of this character may cure any prejudice resulting from an unfavorable comment, if such there was. See United States v. Stromberg, supra, 268 F.2d at 271; United States v. Di Carlo, 64 F.2d 15 (2d Cir., 1933); United States v. De Vasto, 52 F.2d 26, 78 A.L.R. 336 (2d Cir.), cert. denied, 284 U.S. 678, 52 S.Ct. 138, 76 L.Ed. 573 (1931). The court's instruction was historically correct and, we find, could not have been prejudicial, especially in the context of this long trial. See United States v. Stromberg, supra, 268 F.2d at 271.
 
 ALLEGED PREJUDICIAL NEWSPAPER PUBLICITY
 
 49
 One month after the opening of the trial, the New York press reported the violent slaying of Albert Agueci, one of the members of the so-called executive group. The victim, brother of appellant Vito Agueci, was a fugitive from justice at the time. Several of the jurors either read of the incident, heard about it through radio or television, or heard it discussed in the jury room. The news stories stated no reason for the death of the victim, but merely indicated that another defendant had been found dead some months before the trial, and that the brother of the slain man, Vito, was on trial for violation of the narcotics laws.
 
 
 50
 Immediately upon learning of the publicity, Judge Herlands conducted an extensive voir dire of the jury, questioning with great care each juror who had heard of the incident. In response to the questioning, the jurors assured the court that nothing seen or heard would affect their deliberations or ability to render a fair verdict. Throughout the voir dire examination, Judge Herlands repeatedly made it clear that a fair and impartial trial was essential, that it would be necessary to excuse the jurors if their judgment were prejudiced or unduly influenced by the publicity, and that the case was to be decided only on the basis of evidence presented in the courtroom. This last admonition was repeated in the closing instructions to the jury.
 
 
 51
 We hold that the nature of the publicity was such that, when conjoined with the trial judge's cautionary instructions, no prejudice resulted to defendant Vito Agueci or to his codefendants.
 
 
 52
 "The crux of the matter is whether the statements were so prejudical as to require the trial judge, who has large discretion in such matters, * * * to empanel a new jury." United States v. Feldman, 299 F.2d 914, 917 (2d Cir., 1962). In those cases in which newspaper publicity was deemed so prejudical as to warrant reversal and an order for a new trial, the reports contained information regarding such obviously inflammatory and inadmissible matter as the prior criminal record of the defendant, see, e. g., Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959), or clearly incriminatory out-of-court conduct, see, e. g., United States v. Leviton, 193 F.2d 848 (2d Cir., 1951), cert. denied, 343 U.S. 946, 72 S.Ct. 860, 96 L.Ed. 1350 (1952). Another matter of no small consequence which influenced the disposition of the cases cited to us on behalf of the appellants was the instrumental role of the Government in bringing the adverse publicity to light. See United States v. Leviton, supra; Delaney v. United States, 199 F.2d 107, 112-114 (1st Cir., 1952). Certainly these categories are not all-inclusive, but the fact that the information disclosed by the publicity here was not centered upon any particular one of the appellants, did not refer to prior illicit conduct, and did not emanate from the Government but was a matter of general public knowledge, convinces us that the appellants' right to a fair and impartial trial was not impaired.
 
 
 53
 The typical jury, in this age of mass-communications, is not hermetically sealed from the events occurring all about them. Of course, an effort must be made by the trial judge to caution jurors against considering extra-judicial statements pertinent to the guilt or innocence of the individuals upon whom they sit in judgment. Where the cautionary instructions are adequate, as they were here, and where the news reporting was merely routine and hardly inflammatory, the trial judge does not abuse his discretion by refusing to declare a mistrial. See United States v. Stromberg, supra, 268 F.2d at 269-270; United States v. Postma, 242 F.2d 488, 495 (2d Cir.), cert. denied, 354 U.S. 922, 77 S.Ct. 1380, 1 L.Ed. 2d 1436 (1957); United States v. Allied Stevedoring Corp., 241 F.2d 925, 935 (2d Cir.), cert. denied, 353 U.S. 984, 77 S.Ct. 1282, 1 L.Ed.2d 1143 (1957). "Trial by newspaper may be unfortunate, but it is not new and, unless the court accepts the standard judicial hypothesis that cautioning instructions are effective, criminal trials in the large metropolitan centers may well prove impossible." United States v. Leviton, 193 F.2d at 857.
 
 
 54
 These same considerations govern our disposition of the appellants' contention that prejudice was caused by a news story relating the fact that Judge Herlands, during the course of the trial, revoked the bail of the defendants and remanded them to jail. Of the three jurors who heard of this publicity, one had merely been told that there was an article about the trial judge in the newspaper, one had seen the headline but put the article aside as soon as he realized that it related to the case on trial, and one was an alternate juror who did not participate in the jury's deliberations. There is obviously no merit to this contention
 
 
 55
 OTHER POINTS RAISED IN BEHALF OF ALL DEFENDANTS
 
 
 56
 Further issues are raised which pertain to several or all of the defendants. These can be disposed of within briefer compass.
 
 
 57
 The great preponderance of testimony offered on behalf of the Government was that of Matteo Palmeri and Salvatore Rinaldo, two of the former members of the conspiracy. Their testimony was corroborated in certain respects by immigrants who had brought the valises and trunks to this country, by Government agents, by two individuals living in Garfield, New Jersey, who testified to the slip-up at the pier in early September of 1960, and by various documents, such as baggage manifests and passenger lists. It is contended that the evidence against at least one defendant, Luigi Lo Bue, rests solely upon the testimony of coconspirator Matteo Palmeri. It is therefore suggested that we ought to review the federal rule that the uncorroborated testimony of an accomplice is sufficient to convict. We hold, however, that the long-standing federal rule does not require modification. See Caminetti v. United States, 242 U.S. 470, 495, 37 S.Ct. 192, 61 L.Ed. 442 (1917); United States v. Moran, 151 F.2d 661 (2d Cir., 1945); United States v. Schwartz, 150 F.2d 627 (2d Cir.), cert. denied, 326 U.S. 757, 66 S.Ct. 97, 90 L.Ed. 454 (1945); United States v. Quinn, 124 F.2d 378 (2d Cir., 1941); United States v. Gallo, 123 F.2d 229 (2d Cir., 1941). Especially is this principle appropriate in narcotics conspiracy cases, where tangible evidence is often quickly sold or easily destroyed and where conduct and contacts are always furtive. The efficient administration of these vital federal laws could be hampered beyond repair if testimony from the individuals who know most about the illicit activity were insufficient to sustain a conviction of their co-conspirators. We therefore hold that the circumstance that the chief Government witnesses were formerly members of the conspiracy is a matter which goes merely to the weight of their testimony. Certainly the jury should be carefully instructed as to the weight properly given to "the uncorroborated testimony, inconsistent with his earlier testimony in some respects, of an accomplice and co-conspirator who had the strongest possible reasons to become a Government witness." See United States v. Persico, 305 F.2d 534, 536 (2d Cir., 1962). Judge Herlands' instruction to the jury was more than adequate on this score. He stated, "The testimony of Palmeri and Rinaldo, who are accomplices by their own admission, must, as a matter of law, be considered by you with close and searching scrutiny and caution." See Bishop v. United States, 100 U.S.App. D.C. 88, 243 F.2d 32 (1957).
 
 
 58
 Appellants contend also that the grand and petit juries were improperly selected, and that a motion to dismiss the indictment and a challenge to the array of the petit jury were improperly disposed of by the trial court. Jury lists in the Southern District of New York were drawn in this case from lists of persons registered to vote at presidential elections in the counties of New York, Bronx and Westchester. The contention that this method of selection excludes a legally cognizable group from jury service has been exhaustively treated and completely repudiated in the considered opinion of Judge Bryan in United States v. Greenberg, 200 F.Supp. 382 (S.D.N.Y.1961). The qualifications for federal jury service set down in 28 U.S.C. § 1861[9] are strikingly similar to the requirements for voter registration in the state of New York, see United States v. Greenberg, supra, at 389; the cross-section of society represented by those registration lists is so extensive as to render frivolous the assertion of systematic exclusion. See also Dow v. Carnegie-Illinois Steel Corp., 224 F.2d 414 (3d Cir., 1955), cert. denied, 350 U.S. 971, 76 S.Ct. 442, 100 L.Ed. 842 (1956); United States v. Flynn, 216 F.2d 354 (2d Cir., 1954), cert. denied, 348 U.S. 909, 75 S.Ct. 295, 99 L.Ed. 713 (1955).
 
 
 59
 Finally, the appellants as a group contend that the arrest of Rinaldo and Palmeri on October 21, 1960 and the seizure of the narcotics in the false-bottomed trunk, were brought about by information obtained through a wiretap by Westchester County police authorities and transmitted to agents of the federal narcotics bureau. The evidence thus obtained is alleged to be "fruit of the poisonous tree" which has been handed on a "silver platter" from the state to the federal authorities. This contention was asserted below, and Judge Herlands quite properly held an extensive hearing to determine whether the information secured by the state agents through wiretapping had been transmitted to or used by the federal agents in any fashion whatsoever. He concluded that federal authorities "neither received nor used any wiretapping evidence or information derived from the Westchester County authorities or from any other local authorities" and that "the record * * * overwhelmingly supports and sustains the prosecution's contentions." We hold that his conclusions are amply supported by the evidence and are not clearly erroneous. Not only did the state officers sedulously avoid communicating wiretap information to the federal narcotics agents because of a consciousness that such evidence would pollute a federal prosecution, but the record shows that no evidence in any way pertinent to the case at hand was turned up by the taps. Once the defendants offered evidence of the existence of the wiretap, it was incumbent upon the Government to prove that its evidence was not tainted by the tap. United States v. Coplon, 185 F.2d 629, 636, 28 A.L.R.2d 1041 (2d Cir., 1950). The Government clearly satisfied this burden; it was not necessary to go further and disclose the precise source from which its information did come.[10]
 
 
 60
 Moreover, there is no merit to the appellants' contention that documents containing prior statements by Government witness Rinaldo were improperly used on redirect examination. They fall within the rule of "verbal completeness," and were properly used to place in context statements made on cross-examination. See United States v. Lev, 276 F.2d 605, 608 (2d Cir.), cert. denied, 363 U.S. 812, 80 S.Ct. 1248, 4 L.Ed. 2d 1153 (1960); United States v. Apuzzo, 245 F.2d 416, 421-422 (2d Cir.) (en banc), cert. denied, 355 U.S. 831, 78 S. Ct. 45, 2 L.Ed.2d 43 (1957); 7 Wigmore, Evidence §§ 2094, 2115 (3d ed. 1940); McCormick, Evidence 132 (1954). Also without merit is the contention that the trial judge's entry into the jury room — with the consent of all counsel — to inform the jurors that they might leave for lunch, was prejudicial and constituted reversible error. It is undesirable that any information not presented in the courtroom should reach a jury after it has commenced its deliberations, except in those rare instances where all concerned — counsel and the judge — agree that a written communication to the jurors is preferable to bringing them back into the courtroom. But in this instance the judge decided, with everyone's consent, to communicate personally the innocuous message to the jurors. We believe that it would have been wiser had he not, but that it would be "the merest pedantry" to deem his conduct, under the circumstances present here, in any manner prejudicial to the appellants. See United States v. Compagna, 146 F.2d 524 (2d Cir., 1944), cert. denied, 324 U.S. 867, 65 S.Ct. 912, 89 L.Ed. 1422 (1945).
 
 II.
 
 61
 Having disposed of those grounds urged for reversal which would affect most or all of the appellants, we proceed to the arguments raised by particular defendants in their own behalf.
 
 COTTONE'S CONSPIRACY CONVICTION
 
 62
 Filippo Cottone was indicted and convicted under the conspiracy count of the indictment; he was not charged with any substantive violation of 21 U.S.C. § 174, which proscribes, among other things, facilitating "the transportation, concealment, or sale" of a narcotic drug knowing it to have been imported. Cottone's sole connection with the conspiracy was the assistance he rendered to Matteo Palmeri on September 6 or 7, 1960, when Palmeri was unable to use his bakery truck to pick up the false-bottomed trunk waiting at Pier 84. The Government's case against Cottone may be briefly summarized.
 
 
 63
 Albert Agueci had told Palmeri that in the event his truck was ever out of order he should contact Cottone. Palmeri did so, informed Cottone that he needed his assistance to pick up a trunk containing narcotics,[11] and promised him $300 for his help. Cottone accompanied Palmeri to the pier, Palmeri signed for the trunk, and both of them loaded it into Cottone's station wagon. En route to Palmeri's bakery, Cottone made the following comments: "You never had any trouble before. How come you all messed up this time? Like your truck is not in order, and you can't find the passenger and all this trouble. I just can't understand how you people operate. It is like a mess." At the bakery, Cottone was introduced to Rinaldo as a man who was "all right"; this was in response to Rinaldo's query whether Mauro and Caruso knew that Palmeri was "taking another man." Cottone participated in ripping open the false-bottom of the trunk, which contained packages of heroin. Cottone left the bakery with one of the blankets taken from the trunk after all of the packages of heroin had supposedly been extracted. When Palmeri later ascertained that there were still three kilograms of heroin in the lining of the blanket, he informed Cottone of this fact and retrieved the blanket. Cottone received the $300 promised him for his services.
 
 
 64
 We hold that the evidence clearly sustains Cottone's conviction on the conspiracy count. From the testimony summarized above, the jury could have readily inferred that Cottone knew that he was assisting Palmeri in a transaction involving narcotics. But it is urged that although Cottone may have known that the substance imported was narcotics there was insufficient proof from which a jury could conclude that he was aware that the scope of the conspiracy was larger than his instant participation and that there were more conspirators involved. This argument is grounded primarily upon the fact that Cottone was implicated in a single transaction involving only two other individuals.
 
 
 65
 Several cases decided by this court have held that proof of participation in a single isolated narcotics transaction may be insufficient to warrant a conviction for conspiracy. See United States v. Aviles, 274 F.2d 179, 190 (2d Cir.), cert. denied, 362 U.S. 974, 80 S.Ct. 1057, 4 L.Ed.2d 1009 (1960); United States v. Stromberg, 268 F.2d 256, 267 (2d Cir.), cert. denied, 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959); United States v. Reina, 242 F.2d 302, 306 (2d Cir.), cert. denied, 354 U.S. 913, 77 S. Ct. 1294, 1 L.Ed.2d 1427 (1957); United States v. Koch, 113 F.2d 982 (2d Cir., 1940). But, these cases also make it clear that the so-called single-transaction rule is not an arbitrary rule which is to be applied rigidly and without reason. It has been utilized to exonerate a defendant only when there is no independent evidence tending to prove that the defendant had some knowledge of the broader conspiracy and when the single transaction is not in itself one from which such knowledge might be inferred. "A single act may be the foundation for drawing the actor within the ambit of a conspiracy. * * * But, since conviction of conspiracy requires an intent to participate in the unlawful enterprise, the single act must be such that one may reasonably infer from it such an intent." United States v. Aviles, 274 F.2d at 189. We hold that there is independent evidence from which Cottone's knowledge of the overall conspiracy may be inferred, for he was introduced by Palmeri to Rinaldo, was recommended to Palmeri by Albert Agueci for assistance in these particular circumstances, and was present when Rinaldo referred to Mauro and Caruso. Furthermore, his conversation en route from the pier to the bakery revealed that he was an old hand in the conspiratorial operation; so too did his criticism of Palmeri for failing to locate the passenger bringing in the trunk despite the fact that Palmeri had never mentioned any such passenger to him.
 
 
 66
 We need not rest on such particularized pieces of evidence, for we further believe that a jury could reasonably infer from the nature of this single transaction itself that Cottone had knowledge of the conspiracy. He went to Pier 84 to assist in procuring a trunk which he knew to contain narcotics; surely he must have known that the trunk had been imported. He helped to tear open the bottom of the trunk containing blankets in which ten kilograms of narcotics had been secreted. He must have known that such a large quantity of narcotics had not reached their resting place, and the inference is again inescapable that he knew that they would soon be distributed to other illicit purchasers. It was under similar circumstances that this Court found sufficient evidence to support the conspiracy conviction in United States v. Bruno, 105 F. 2d 921 (2d Cir.), rev'd on other grounds, 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257 (1939).
 
 
 67
 We have recently held that "From evidence of knowledge of the conspiracy and a transaction with one of its members it would be reasonable to infer intent to participate in it * * *." United States v. Aviles, 274 F.2d at 190. We hold that there was ample evidence to support Cottone's conviction on the conspiracy count.
 
 PROSECUTOR'S REMARKS IN SUMMATION
 
 68
 Cottone argues that there is still another ground for reversing his conviction. He charges that he was prejudiced by the improper insinuation made in the prosecutor's summation that the lawyer representing both Cottone and Scopellitti had been instrumental in suborning their false testimony. Prior to the trial, Mr. Lewis, who was Cottone's attorney, was requested by the court also to represent the indigent defendant Scopellitti. This he agreed to do. Before this, both Cottone and Scopellitti had made pretrial statements. Their testimony at trial, however, was different from those statements, and both erected a similar defense.[12] The Government prosecutor, in calling these facts to the attention of the jury, stated:
 
 
 69
 "* * * because that is what they told us before, wouldn't you think or you might assume that they are going to give basically the same story again? But then what happened? They are both represented by Mr. Lewis. Both of them take the stand and both of them have almost identical defenses. * * * What a coincidence that is, too * * *."
 
 
 70
 It is contended that the remark was so prejudicial to both Cottone and Scopellitti that a mistrial should have been ordered and that, on appeal, the defendants' convictions should be reversed.
 
 
 71
 There is no doubt that the prosecutor's thinly veiled accusation of subornation of perjury on the part of Mr. Lewis was irregular and improper. It would have been appropriate for the trial judge to intercede sua sponte in order to caution the jury to ignore the prosecutor's remarks. Such a remark by the prosecutor might, in a case where the evidence against the particular defendants was very tenuous, have caused enough prejudice to be thrust upon the scales of justice, such that they would be tipped onto the side of conviction; we would then be constrained to reverse and order a new trial. But, although we disapprove of the prosecuting attorney's remarks, we feel that the evidence in support of Cottone's conspiracy conviction was strong enough, and this isolated incident not sufficiently prejudicial in the context of this long trial, see United States v. Stromberg, supra, 268 F.2d at 271, to warrant a reversal.
 
 
 72
 In reaching our conclusion, we further note that although Mr. Lewis, after the entire summation was completed on December 22, 1961, approached the bench "on a point of personal privilege" to ask that the prosecutor's attack be referred to the bar association, there was at that time no formal objection or suggestion that the portion of the summation in question affected the rights of his clients. Nor was a motion then made for a mistrial. Specifically, Mr. Lewis objected to what he considered to be a slur upon his personal integrity. Had a corrective charge been requested, it is likely that one would have been given promptly, for the trial judge was accommodating in that respect — as witness his supplemental instruction regarding the right of the defendants not to take the stand; but no such request was made.
 
 
 73
 The trial judge instructed all counsel on December 22 to submit in memorandum form on the next trial date, December 26, any motions, objections, or exceptions to the day's proceedings. It is significant that it was not until the latter date that counsel for Cottone and Scopellitti attempted to articulate that the prosecutor's summation was prejudicial to his clients. What must have been confusing to the trial judge, however, was the fact that counsel's written objection (Court's Exhibit XVIII) still appeared to be mainly concerned with correcting the unwarranted attack on his professional honor. Much the greater part of his objection was directed to the effect which he believed the prosecutor's comments had upon his standing at the bar. The first sentence of the objection asked for a withdrawal of a juror and the declaration of a mistrial "because of the scurrilous attack made upon counsel"; counsel urged in the alternative that if the mistrial be denied the case should be reopened so that he might prove his many years of devotion to and respect at the bar. He coupled this with a request that the prosecutor's accusations be presented to a grand jury and if untrue that they be called to the attention of Chief Judge Lumbard for disciplinary action. He concluded his written objection with the following statement: "This Court is urged to take the necessary steps to inquire into the truth of the prosecutor's remarks so that counsel's good name and his standing as an honorable member of the bar be preserved." It is significant that, despite the formalization of his objection in the written memorandum of December 26, counsel did not even then seek a corrective charge. The judge charged the jury shortly after these objections were voiced. He could with little difficulty have given a corrective charge had counsel requested it and had he not distracted the judge by demands for an investigation of his conduct by the bar association, the grand jury, and the Chief Judge. We are agreed that had a proper corrective charge been given, counsel would have no cause to complain here. See United States v. Stromberg, 268 F.2d 256, 271 (2d Cir.), cert. denied, 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959). We should not reward him for his failure to make this request.
 
 
 74
 In any event, we choose to reject the assertion of error for the reason that, while the prosecutor's remarks were improper, we do not think they were so prejudicial as to require a new trial. Cf. United States v. Greenberg, 268 F. 2d 120, 123-124 (2d Cir., 1959); United State v. De Fillo, 257 F.2d 835, 840 (2d Cir., 1958), cert. denied, 359 U.S. 915, 79 S.Ct. 591, 3 L.Ed.2d 577 (1959); Williams v. United States, 265 F.2d 214, 216-217 (9th Cir., 1959).
 
 
 75
 Appellant Scopellitti joins in urging that this incident was prejudicial to him as well, especially, he says, in light of allegedly insufficient evidence to support a finding that he had knowledge that narcotics were contained in the trunk he brought to this country on August 10, 1960. He admits, arguendo, to knowledge of the smuggling operation and the false-bottomed trunks, but contends that there is no proof that he knew the substance smuggled was narcotics rather than some other material. We cannot agree. Palmeri testified that Scopellitti and Rinaldo broke open the bottom of the trunk Scopellitti brought to this country and extracted ten packages of narcotics; Scopellitti had earlier reassured his colleagues, "don't worry. I know what it's all about." We hold that the evidence was sufficient to support Scopellitti's convictions for conspiracy and the substantive importation violation of the narcotics law; and, for the reasons already stated, that the prosecutor's attack upon the defendant's counsel did not warrant reversal.
 
 
 76
 VALACHI'S PURPORTED WITHDRAWAL FROM THE CONSPIRACY
 
 
 77
 Appellant Valachi was convicted on the conspiracy count only. Midway during the conspiracy, on March 28, 1960, he surrendered himself to the United States Attorney for the Eastern District of New York on another violation. He contends that this constituted withdrawal from the conspiracy as a matter of law, and therefore that the trial judge erred in denying his motion for a severance, his request to instruct the jury to disregard as to him the acts and declarations of his co-conspirators after his incarceration, and his motion for a special verdict on the issue of his withdrawal.
 
 
 78
 Even if it were true that Valachi's incarceration terminated his relationship to the conspiracy as a matter of law, it is doubtful that the denial of his motion to be tried separately would be reversible error. Under Rule 14 of the Federal Rules of Criminal Procedure, "If it appears that a defendant * * * is prejudiced by a joinder of offenses or of defendants in an indictment * * * or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires." We could not hold that the prejudice to Valachi caused by a joint trial with several co-conspirators would, under the circumstances of his case, where we believe an overall conspiracy has been established, make it an abuse of discretion for Judge Herlands to refuse to sever. See Schaffer v. United States, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed. 2d 921 (1960). There was substantial evidence of Valachi's participation in the conspiracy prior to his incarceration, and the significance of his withdrawal relates only to the improper use against him of subsequent acts and declarations of co-conspirators. Cf. Cleaver v. United States, 238 F.2d 766 (10th Cir., 1956).
 
 
 79
 The law is clear, however, that while arrest or incarceration may constitute a withdrawal from a conspiracy, it does not follow that in every instance it must. On facts almost identical to those before us, the Court of Appeals for the Sixth Circuit recently held that the defendant's participation in the conspiracy was not terminated. See Poliafico v. United States, 237 F.2d 97 (1956), cert. denied, 352 U.S. 1025, 77 S.Ct. 590, 1 L.Ed.2d 597 (1957). See also Pinkerton v. United States, 328 U.S. 640, 646-647, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Here, not only was there no conclusive evidence of Valachi's affirmative withdrawal from the conspiracy, see Hyde v. United States, 225 U.S. 347, 369, 32 S. Ct. 793, 56 L.Ed. 1114 (1912); United States v. Stromberg, supra; United States v. Cohen, 145 F.2d 82, 90 (2d Cir., 1944), cert. denied, 323 U.S. 799, 65 S.Ct. 553, 89 L.Ed. 637 (1945); Marino v. United States, 91 F.2d 691 (9th Cir., 1937), but there was positive evidence that Valachi had in fact designated Porcelli, Guippone, and others to look after his interest in the conspiracy after his incarceration. Since Valachi was to get a share in the profits made on sales by those co-conspirators, there is little question but that he continued to have a stake in the success of the venture.
 
 
 80
 Certainly the jury could have disbelieved this evidence and found that Valachi had in fact withdrawn from the conspiracy; if he had, then subsequent acts and declarations of coconspirators could not be used against him and he could not be responsible for the acts committed by this colleagues in furtherance of the conspiracy. Pinkerton v. United States, supra. An instruction to this effect was given[13] and was sufficient to guard against prejudice. While Judge Herlands could, in his discretion, have ordered a special verdict on this issue, it was not an abuse of discretion to refuse to do so.
 
 
 81
 REPEATED ASSERTION OF PRIVILEGE AGAINST SELF-INCRIMINATION BY PORCELLI
 
 
 82
 Appellant Porcelli took the stand in his own defense in order to establish that his dealings with Government witness Rinaldo were not related to any narcotics conspiracy but solely to certain gambling ventures. On cross-examination the prosecutor sought to probe further into the coincidence that these alleged gambling activities would have taken place during the same period as the charged conspiracy; he therefore asked Porcelli whether he engaged in those activities during the years just prior to the period covered in the indictment. To the prosecutor's questions whether he was in the "gambling business" in the years 1959, 1958, and 1957, Porcelli replied that he did not know or did not remember. After a discussion at the bench, the prosecutor reiterated the question regarding the year 1958 and, upon advice of counsel, Porcelli asserted his privilege against self-incrimination. The prosecutor, in a series of seventeen questions, put the same query to Porcelli for the years 1957 back through 1941. Each time, the witness asserted his privilege against selfincrimination. It is argued on appeal that the prejudice caused by this episode warrants reversal of Porcelli's conviction.
 
 
 83
 We believe that, although this general thread of questioning might have been relevant in view of Porcelli's direct testimony, the prosecutor's tactics on cross-examination were improper. It is true that the prosecutor was justified in probing the truth of Porcelli's claim that his gambling activities were coincident with the period of the conspiracy, especially in light of Porcelli's halting responses to the first in the string of questions. This was information bearing not only on the factual issues being tried but also on Porcelli's credibility. But questions regarding the earliest years, if answered, would at best have elicited information remote in time from the period of the indictment. Furthermore, it became obvious that Porcelli's response to each ensuing question was certain to be an assertion of privilege. But, no objection was made during the course of the questioning and, especially in the absence of any significant showing of prejudice, we feel that the appellant should be precluded from raising this issue for the first time on appeal. "The victim of alleged prejudice cannot be allowed to nurse it along to the point of reversibility and then take advantage of a situation which by his silence he has helped to create." United States v. Five Cases, 179 F.2d 519, 523 (2d Cir.), cert. denied, 339 U. S. 963, 70 S.Ct. 997, 94 L.Ed. 1372 (1950).
 
 
 84
 We find appellants' other contentions to be without merit.
 
 III.
 
 85
 This mass-conspiracy case, in presenting us with a great number of difficult problems arising in the course of two months of trial, and in which the record consumed almost 8000 pages, is not untypical of many cases that have come before this Court in the past. It is, therefore, in order for us to concern ourselves with a recurrent feature of this class of case, a feature which often goes undiscussed in judicial opinions. The trial of these multiple-defendant conspiracy cases poses a great problem for the district judge. We recognize that if a narcotics conspiracy is of such dimension as to include a confusing array of defendants, it is inherent in the nature of the crime that the trial is certain to be rather protracted. The great problem confronting the district judge is therefore one of trial management. The jury must constantly be made aware of the fact that there are separate individuals on trial and that each must be judged solely on the evidence properly admissible against him. The difficulties of compartmentalizing the independent evidence in the mass-conspiracy case, and of focussing the attention of the jury on that evidence before consideration may be given to hearsay, are so manifest that we would labor the point were we to say more. But we should call attention to these problems, for in the Southern District of New York there has been a disconcerting increase in the number of indictments and trials involving the mass conspiracy. Judges there are confined for months on end, engaged in trying these cases.
 
 
 86
 The solution to these problems of judicial administration of the criminal law which we recognize to be difficult to find, is largely in the hands of the United States Attorney, for he is in a position in the first instance to determine whether it would be more in the interests of criminal justice to restrict the number of defendants tried at any one time. If such were done, then it would be possible to minimize the harassing problems arising from the participation of the great number of separate counsel representing individual defendants, each pursuing his own course in seeking the acquittal of his client. Each counsel, understandably in the mass-conspiracy case, makes a determined effort — which sometimes unfortunately shades into a misguided effort — to distinguish his client from other defendants on trial; he often duplicates matter covered by other counsel, prolongs cross-examination by repetitiveness, becomes more vigorous in his trial demeanor than might ordinarily be proper, and becomes unduly adamant about trial technicalities. Of course the trial judge has a wide discretion to limit needlessly repetitive cross-examination either by the same counsel or by successive counsel and he also may curtail examination which is of doubtful relevance. Some of the cross-examination in this case went beyond the bounds of any possible need and served only to waste the time of the court and the jury. We have observed that these trials do not always steer a straight course toward the determination of innocence or guilt, but are rather excursions into tangential issues, characterized by many side-bar hearings, disruption of the flow of evidence, and other time-consuming tactics. These only add to the extraordinary hardship of the lay juror who, usually at great inconvenience, takes weeks or months away from his ordinary pursuits in order to fulfil his civic responsibility of jury service. We recognize that the defense of an accused in a mass-conspiracy case is a difficult task, but we are certain that the task can be performed with the dignity that brings credit to the judicial process. We remind counsel in such cases that while their task requires them to be partisan they are officers of the court and as such are expected to aid the judge in demonstrating that a trial in an American court is indeed an orderly search for the truth.
 
 
 87
 It is therefore the responsibility of all concerned in the class of case before us — the trial judge, the United States Attorney, defendants' counsel — to make every effort to resolve the great problems that are raised in this perhaps most difficult area of criminal law administration.
 
 
 88
 We are grateful to Lawrence A. Kobrin, Esq., who, as assigned counsel for appellant Scopellitti, has vigorously represented him in the preparation and presentation of this appeal.
 
 
 89
 The judgments of conviction as to all of the defendants are hereby affirmed.
 
 
 
 Notes:
 
 
 [1]
 Filippo Cottone received a five-year sentence; Rocco Scopellitti, ten years; Vito Agueci, Luigi Lo Bue, Anthony Porcelli, and Charles Tandler, fifteen years; Robert Guippone, Matthew Palmieri, and Joseph Valachi, twenty years; Charles Shiffman, sentenced as a multiple narcotic offender, received a twenty-five year sentence
 
 
 [2]
 Charles Di Palermo, George Guido, Mario Mazzaro, Vito Mazzaro, Joseph Ragone, Rocco Sancinella, Salvatore Valente, and Ralph Wagner
 
 
 [3]
 William Holmes died before the trial and Albert Agueci, who was a fugitive, died during the trial. Vincent Mauro, Frank Caruso, Salvatore Maneri and Morris Taubman fled the jurisdiction. John Papalia had not, at the time of trial, been extradited from Canada. Arnold Barbeto was found incompetent to stand trial
 
 
 [4]
 Albert Agueci, a fugitive at the time of trial, was killed during the course of the trial. His brother Vito is one of the appellants before us
 
 
 [5]
 Matteo Palmeri is not to be confused with Matthew Palmieri, one of the appellants
 
 
 [6]
 Ralph Wagner, named in the indictment but not a defendant below, and William Holmes, named as a co-defendant below who died before trial
 
 
 [7]
 Scopellitti contends, however, that the Government's proof indicates that he was requested to leave before the packages of narcotics were removed from the bottom of the trunk, and that there was thus no proof that he was aware of the substance allegedly smuggled into the country
 
 
 [8]
 Earlier in his charge the judge clearly emphasized the need to individualize and compartmentalize when he stated "It is your recollection and your recollection alone that determines whether or not the following items advanced by the Government's contentions prove, with respect toeach substantive count concerning which the asserted items of proof respectively relate that, the substance was heroin hydrochloride." And in another portion of his charge he stated: "However, with respect to all of the substantive counts, as distinguished from the conspiracy count, you must be convinced beyond a reasonable doubt that the substance involved in each of such substantive counts was a narcotic drug * * *" (Emphasis added).
 
 
 [9]
 "Any citizen of the United States who has attained the age of twenty-one years and who has resided for one year within the judicial district, is competent to serve as a grand or petit juror unless —
 "(1) He has been convicted in a State or Federal court of record of a crime punishable by imprisonment for more than one year and his civil rights have not been restored by pardon or amnesty.
 "(2) He is unable to read, write, speak, and understand the English language.
 "(3) He is incapable, by reason of mental or physical infirmities to render efficient jury service."
 
 
 [10]
 The Government did, in fact, introduce testimony that it had independently secured evidence against members of the conspiracy well before the date of the state wiretap. On September 8, 1960, federal narcotics agent Brown purchased almost $4000 worth of narcotics from Maiello, one of the co-conspirators. The state wiretapping commenced on September 23, and the cooperation of state and federal agents regarding Rinaldo's activities commenced in early October
 
 
 [11]
 On cross examination he testified that he told Cottone "The trunk contains narcotic (sic) on the double bottom of the trunk, so when the inspector opens the trunk we shouldn't worry about nothing."
 
 
 [12]
 In his pretrial statement, Cottone denied that he had been at Pier 84 in his car during 1960. Scopellitti, in his statement, said that he had brought only two valises containing personal clothing when he returned to this country. At the trial, both denied material facts contained in those statements and offered exculpatory defenses. Each admitted that he had been at the pier. Cottone said that he had been there merely to help Palmeri pick up a trunk, the contents of which were unknown to him. Scopellitti testified that he had in fact brought a valise and a trunk from Italy, the latter as a favor for a friend, and that he was unaware of the narcotics concealed in the false bottom of the trunk
 
 
 [13]
 "* * * if you find that the conspiracy so far as concerns Valachi terminated on March 28, 1960, when he was remanded, then and in the event that you so find, any evidence introduced during the trial as to acts, conversations and declarations by other alleged co-conspirators, which occurred after March 28, 1960, should not be considered by you against Valachi."