**UNITED STATES of America,
Appellee,**

v.

**Enrique BARRERA et al., Appellants.**

**Nos. 960–963, Dockets 73–1227, 73–1293, 73–1303 and 73–1343.**

United States Court of Appeals,
Second Circuit.

Argued June 8, 1973.

Decided Oct. 9, 1973.

Walter J. Higgins, Jr., New York City (Arthur J. Viviani, Jeffrey Harris, John W. Nields, Jr., Asst. U. S. Attys., Whitney North Seymour, Jr., U. S. Atty., on the brief), for appellee.

Paul A. Goldberger, New York City (Goldberger, Asness, Feldman & Breitbart, New York City, on the brief), for appellant Barrera.

Gilbert S. Rosenthal and Joel A. Brenner, New York City, for appellant Bornsztejn.

Jay Goldberg, New York City, for appellant Enriquez.

Gretchen White Oberman, New York City, for appellant Pinto.

John L. Pollok, New York City (Lenefsky, Gallina, Mass, Berne & Hoffman, New York City, on the brief), for appellant DeLuca.

Before HAYS, MANSFIELD and MULLIGAN, Circuit Judges.

HAYS, Circuit Judge:

These are appeals from judgments of conviction entered in the United States District Court for the Southern District of New York after a jury trial. The five appellants were each convicted of conspiracy to import, possess with the intent to distribute and distribute approximately one-eighth of a ton of heroin, and of the substantive offense of possession with intent to distribute approximately one and one-half kilograms of heroin, in violation of 21 U.S.C. §§ 812, 841, 846 and 963. Appellants Barrera and Bornsztejn were each sentenced to consecutive terms of imprisonment of 15 years on the conspiracy count and 10 years on the substantive count, fines of $50,000 and special parole terms of 3 years. Enriquez was sentenced to imprisonment for 6 years on the conspiracy count and 6 years on the substantive count, the terms to run consecutively, as well as a special parole term of 3 years, while Pinto was sentenced to consecutive terms of 15 years for the conspiracy count and 10 years on the substantive count plus a special parole term of 3 years.

Appellant DeLuca made a motion before trial under 18 U.S.C. § 4244 to have himself declared mentally incompetent to stand trial, which motion was denied (as were motions to suppress certain evidence). After standing trial and having been found guilty, DeLuca was provisionally sentenced under the provisions of 18 U.S.C. § 4208(b) and was committed to the Bureau of Prisons for a psychiatric study. He has not yet been resentenced.

We affirm the convictions of all the appellants.

## I. *The Factual Background*

This case involves an international conspiracy to import heroin into the United States from Europe—a conspiracy which government agents followed almost from its inception in Europe to its consummation on the streets of New York City. Not only was the European portion of the conspiracy known to the United States Bureau of Narcotics and Dangerous Drugs as well as to both the French and Belgian police authorities, but the individual who had been recruited by the European drug shippers to carry the drugs to New York was—unfortunately for the plotters—a government undercover agent.

Under the plan the European shippers were to fill three military footlockers with 120 kilos of pure heroin. The courier, who had military connections, was to transport the footlockers by military plane to Washington, D. C. where he was to rent a car of a certain description, put the footlockers inside the car and drive it to New York City. The plan called for the courier to abandon the car early on the morning of May 16, 1972 in the vicinity of Bloomingdale's department store on the east side of Manhattan where the buyers were to pick up the car. The payment for the narcotics was to be wired by a co-conspirator from his bank account in New York to an account in Switzerland. The evidence established that appellants Barrera, Enriquez and DeLuca were the buyers; that appellant Bornsztejn was to wire the money from his New York account to one he held in Switzerland; and that appellant Pinto was to oversee the transfer in New York as a representative of the European shippers.

The undercover agent left Belgium for Washington, D. C. on May 14, 1972 ostensibly acting as courier for the plotters. Before his departure he emptied the three footlockers which had been filled with pure heroin and left all but three small bags of the drugs with Belgian and French police authorities in Brussels. Upon arriving in Washington,

he packed one of the three remaining bags into each of the three footlockers which were otherwise filled with packages of non-narcotic substances resembling the heroin the courier was supposed to be carrying. The courier then rented a car of the exact description that the European shippers had requested, placed the footlockers in the car and set out for New York City.

What followed on the morning of May 16 in the vicinity of Bloomingdale's was surveilled by numerous government agents who were on the scene. It was also recorded on film in movies and still photographs. Agents of the Bureau of Narcotics and Dangerous Drugs had been alerted to the location of the rendezvous spot by the undercover agent. At 6:30 A.M. appellants Bornsztejn and Pinto appeared in the neighborhood of Bloomingdale's department store and proceeded to walk about for a half hour without apparent direction but never leaving a narrowly circumscribed area, and conversing continuously with each other. The surveilling agents who were at first unaware of their involvement in the transaction soon noticed the intense interest Pinto and Bornsztejn showed in the area where the agent-courier had been instructed to leave the heroin laden car.

During this same period appellants Barrera and Enriquez arrived in the area in the latter's car and parked on a side street in the vicinity of Bloomingdale's. Barrera left the car and proceeded to walk toward the store while Enriquez remained behind in the car.

At approximately 7 A.M., Bornsztejn and Pinto separated. At seven o'clock the agent arrived in the car, parked it in front of the store, hid the keys under the dashboard, left the car and entered a subway, as he had been directed to do by the European shippers of the heroin. Pinto spotted the car first and pointed it out to Bornsztejn who then left Pinto and approached Barrera, with whom he shook hands. Bornsztejn and Barrera walked toward the car and upon reaching it Bornsztejn turned around and walked back in the direction from which he had come while Barrera entered the car, took the keys from their hidden location and drove off.

Barrera drove the car with the heroin in it up the side street in which Enriquez was parked, made a hand motion to him, and then continued driving. Enriquez followed him. After reaching what apparently was a predetermined spot, a spot which Barrera could have reached *without* driving on the side street on which Enriquez had been parked, the two cars stopped and parked. Enriquez and Barrera went into a nearby coffee shop where they were joined by appellant DeLuca who was handed something by Barrera. DeLuca then left the coffee shop and drove off in the car containing the drugs. Shortly thereafter, Barrera and Enriquez also left the coffee shop and drove around the east side of New York until they were arrested at 8:15 A.M.

Meanwhile, Pinto and Bornsztejn left the area of Bloomingdale's and drove first to the hotel where Bornsztejn was staying and then to the hotel where Pinto was staying. They then returned to the area where the transfer had taken place, circled it for about 15 minutes and finally parked their car in front of the same coffee shop where Barrera, Enriquez and DeLuca had met. They got out of their car and walked around for awhile, then reentered their car and drove about apparently aimlessly, until they too were arrested at about 9 A.M.

In the meantime appellant DeLuca drove the car containing the footlockers from Manhattan over a bridge spanning the East River to a garage in the borough of Queens. On the way to the garage, DeLuca stopped his car and pulled over to the side of the road to allow traffic behind him (including two surveilling cars) to pass. He was arrested at about 8:15 A.M. while in the process of unloading footlockers.

Several post-arrest statements were taken from the various appellants who attempted to explain their unusual be-

havior on that May morning. None of the explanations are credible when considered in light of the uncontradicted evidence of the actions of the appellants. Indeed, the statement by Enriquez—the appellant whose case might be considered the closest regarding sufficiency of the evidence concerning his knowledge of the ultimate goal of the conspiracy—was most incriminating. On the afternoon that he was arrested, Enriquez told an Assistant United States Attorney that he had driven to New York City that morning leaving his home at 6:20 A.M. He said that he had parked his car in a garage, had breakfast with Barrera and then had gone back to the garage when he had left his car and retrieved it at 8:15 A.M. When he was asked about his actions between 6:20 and 8:15 he said, "I know what I did and I will accept the consequences but I don't want to get anybody. else in trouble." He also denied knowing appellant DeLuca (although the two were seen with Barrera in the coffee shop) and he stated that although he knew "something was up" from talking with Barrera, he knew nothing about the heroin and "if the guy who owns the stuff, Barrera, tells the truth I can get out of this case."

Evidence discovered after the arrest of the appellants pointed to the close-knit nature of the conspiracy. Barrera's business telephone number was found in Bornsztejn's possession at the time of the latter's arrest as was the latter's passport showing that he had entered the country on May 4, 1972. On April 16, 1972, Bornsztejn opened an account at a New York bank which was used to transfer money to another account in his name in a Swiss bank. Finally, found in possession of Pinto, who was known throughout as Ben Sadoun, was a French passport with his photograph but showing it was issued on May 8, 1972 in the name of Jean Claude Pinto and showing entry into the United States on May 10, 1972.

## II. *The Sufficiency of the Evidence*

### *The Conspiracy Count*

The single thread running through the arguments of all of the appellants in this case is their claim that there was insufficient evidence presented at trial to convict them of the violations charged by the government. We reject these contentions as being without merit. The appellants' association in a wide-ranging conspiracy to import heroin into the United States is clear beyond any doubt. Their actions, recorded on film, were in exact accord with the plan as explained to the undercover agent who acted as courier for the illicit shipment. Appellants ask us to believe that it was merely an extraordinary coincidence that these appellants appeared at the specific spot at the exact time arranged by the European shippers. We are not so credulous.

While it is more evident that the appellants other than Enriquez knew that they were playing parts in the implementation of a scheme to import, possess or sell the single shipment of narcotics, Enriquez' unusual actions on the morning of May 16, his inability to account for his movements between 6:20 and 8:15, his conduct at the rendezvous spot as well as at the coffee shop, provide adequate support for his conviction. To buttress that conclusion, we need only note his connection with Barrera who obviously was a key link in the conspiracy, his denial of knowing DeLuca although he had been seen with him and Barrera at the coffee shop on the morning of the transfer, and a statement he made after his arrest that he knew what he was doing and would take the consequences.[1]

---

1. Enriquez argues that the trial judge improperly refused to permit him to show that he made a later statement which he claims to be exculpatory. However, the court did allow him to show that he said that he did not know that heroin was involved which was the gist of the later statement. The rest of the statement, implicating his code-

When the record is considered as a whole, there was ample evidence to sustain the conspiracy convictions of all of the appellants.

### III. *Other Contentions*

In addition to their claims as to the insufficiency of the evidence appellants present a number of contentions, upon which they hope to win reversal of their convictions. We find all of these to be without merit and some to border on the frivolous. We will consider briefly only the most serious.

### A. *Hearsay Testimony*

■ The appellants argue that the trial court erred in admitting against them certain statements made by one of the European shippers to the undercover agent who testified as to the statements at trial. We cannot agree. There was sufficient independent evidence of defendants' individual participation in the conspiracy to warrant the admission of the hearsay declarations of a coconspirator made in furtherance of the conspiracy and during its course. See United States v. Calabro, 449 F.2d 885, 889 (2d Cir. 1971), cert. denied, 404 U.S. 1047, 92 S.Ct. 728, 30 L.Ed.2d 735 (1972). Not only was there independent proof of the agent's receipt of the narcotics in Europe and his transporting them to New York, but the evidence clearly showed the shippers' instructions to deliver the heroin at Bloomingdale's, the simultaneous travel to the United States from France by Bornsztejn and Pinto and the presence and incriminating participation of the appellants in the receipt of the heroin.

### B. *Entrapment, Overreaching Due Process*

■ Appellants claim in effect that without the active participation of the undercover agent the criminal conspiracy never would have occurred. Thus they argue that they were entrapped as a matter of law. We reject this conten-

tion. The appellants were clearly predisposed to commit the crimes they have been convicted of committing. Even prior to the recent Supreme Court pronouncement on entrapment, See United States v. Russell, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), the decisional law would not support the appellants' claims in this case. See United States v. Ortega, 471 F.2d 1350 (2d Cir. 1972), cert. denied, 411 U.S. 948, 93 S. Ct. 1924, 36 L.Ed.2d 409 (1973).

### C. *Post-Arrest Statements*

■ Appellants Bornsztejn and Barrera contend that certain post-arrest statements made by them on the afternoon of May 16 were improperly admitted into evidence. However, in the light of the trial judge's finding, after a hearing, that *Miranda* warnings were given the appellants—a finding amply supported by the evidence—we conclude that the statements at issue were properly admitted at trial. Bornsztejn, Barrera and Enriquez also argue that their statements were obtained during a period of unnecessary delay in violation of 18 U. S.C. § 3501. This argument, raised for the first time on appeal, is without merit. The delay was slightly in excess of six hours and there is no showing that it was for any purpose other than the legitimate one of routine processing. See United States v. Marrero, 450 F.2d 373 (2d Cir.1971), cert. denied, 405 U. S. 933, 92 S.Ct. 991, 30 L.Ed.2d 808 (1972).

### D. *DeLuca's Insanity Defense*

■ Appellant DeLuca claims that he was incompetent to stand trial, that the government proof of sanity was insufficient to support the jury's verdict of criminal responsibility beyond a reasonable doubt, that permitting the psychiatrist who gave him his § 4244 examination to testify was improper under the holding of United States v. Driscoll, 399 F.2d 135 (2d Cir.1968) and that the jury should have been instructed that

---

fendant Barrera, clearly presented the judge with a *Bruton* situation in which he acted well within his discretion. See Bruton v.

United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

DeLuca could be found not guilty by reason of insanity. We reject all of these contentions. The question of De-Luca's sanity was for the jury to decide. His arguments were fairly and adequately presented to the jury as were those of the government. See United States v. Bohle, 475 F.2d 872 (2d Cir. 1973). Sufficient evidence was presented to permit the jury to find beyond a reasonable doubt that DeLuca (who after all had been selected to be the ultimate recipient of the valuable illicit shipment) had the requisite mental capacity. See United States v. Freeman, 357 F.2d 606 (2d Cir. 1966). United States v. Driscoll, supra, is not in point since the government's psychiatrist did not express an opinion based on his earlier § 4244 examination. This circuit does not provide for a verdict of "not guilty by reason of insanity" as requested by the appellant. See United States v. Freeman, supra. Finally, the trial judge was well within his discretion in refusing to allow further lay testimony as to DeLuca's post-arrest behavior, in denying the appellant's request for a continuance for further scientific tests and in refusing to permit collateral impeachment of the government's expert witness.

### E.  Motion to Sever

 Barrera and Bornsztejn argue that the trial court was in error when it denied their request to sever the trial of DeLuca from that of the remaining appellants. They base their claim for severance on the fact that in presenting his insanity defense. DeLuca's counsel posed certain hypothetical questions to expert witnesses which assumed the truth of some of the government's contentions about the participation of the other appellants in the conspiracy. They claim that this prejudiced them and thus they were denied a fair trial. Although we consider this a close question, especially in light of DeLuca's counsel's summation which conceded DeLuca's participation in the conspiracy, we do not find the failure to sever to constitute grounds for reversal. In the light of the trial judge's repeated instructions to the jury that the statements of De-Luca's counsel were not evidence and that no inferences were to be drawn from the hypotheticals, the denial of the motion to sever was thus not an abuse of discretion.

### F.  Jury Instructions

Appellant Barrera contends that the trial court erred in failing to instruct the jury that they should acquit all of the appellants if the government failed to prove the single conspiracy as charged.

 There was no need to instruct the jury as to multiple conspiracies. Only one conspiracy was alleged and proved. Barrera's request was properly denied. See United States v. Calabro, supra.

 Appellant DeLuca challenges that portion of the charge which defined proof beyond a reasonable doubt in terms of an "abiding belief."[2] Although

---

2. The court's charge on reasonable doubt stated in pertinent part:

"Now, the question arises what is a reasonable doubt. It is a doubt which a reasonable person has after carefully weighing all the evidence, the kind of doubt which would make one hesitate to act. Reasonable doubt is doubt which appeals to your reason, to your judgment, to your common sense and to your experience. It is not caprice or whim or speculation. It is not an excuse to avoid the performance of an unpleasant duty. Nor is it sympathy for any party.

"If after a fair and impartial consideration of all of the evidence or lack of evidence you can honestly say that you do not have an abiding belief as to the defendant's guilt, then you have a reasonable doubt and it is your duty to acquit. On the other hand, if after a fair and impartial consideration of all of the evidence you can honestly say that you do have an abiding belief as to a defendant's guilt, then you have no reasonable doubt and it is your duty to convict.

"A reasonable doubt does not mean positive certainty beyond all possible doubt. The law in a criminal case is that it is sufficient if the guilt of a defendant is established beyond a reasonable doubt, not all possible doubt."

we think that the charge on reasonable doubt could well have been more complete, the charge given was not so inadequate as to require reversal.

The remaining claims do not merit discussion.

We affirm.