UNITED STATES of America, Appellee,

v.

Eduardo ARROYO et al., Appellants.

Nos. 498, 499, 503, 524 and 673, Dockets
73–2193, 73–2332, 73–2339, 73–2511
and 73–2311.

United States Court of Appeals,
Second Circuit.

Argued Jan. 9, 1974.

Decided March 22, 1974.

Franklin B. Velie, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty., S. D. N. Y. and John J. Kenney and S. Andrew Schaffer, Asst. U. S. Attys. of counsel), for appellee.

Albert J. Krieger, New York City, (Alan F. Scribner, New York City, of counsel), for appellant Arroyo.

Jay Goldberg, New York City, for appellant Perez.

Alvin K. Hellerstein, New York City (Paul S. Levy, Stroock & Stroock & Lavan, New York City, of counsel), for appellant Sanchez.

Stanley M. Meyer, Brooklyn, N. Y. (Preminger, Meyer & Light, Brooklyn, N. Y., of counsel), for appellant, Gonzalez.

Julio R. Ferrer, pro se.

Before DANAHER,* LUMBARD and TIMBERS, Circuit Judges.

DANAHER, Senior Circuit Judge:

The massive conspiracy here involved all five appellants,[1] convicted after a jury trial, following the importation, possession and distribution of heroin, and their joining in an effort to bring about the escape of a federal prisoner. The jury additionally found that Arroyo, Gonzalez and Perez were guilty of possessing heroin with the intent to distribute. Perhaps most important of the various claims of error is that advanced by Arroyo and Gonzalez that a Government informant,[2] after the indictment had been returned, improperly had attended meetings of these two accused and their lawyers, thus violating their Sixth Amendment right to a confidential attorney-client relationship. This aspect of the case will hereinafter be discussed, but otherwise we have no difficulty in concluding that the appellants were in no way deprived of a fair trial. The judgments of conviction are affirmed.

I.

We need only generalize to provide the background for the prosecution and the trial, for it is clear enough that each participant must have known that he was involved in one of the largest[3] heroin importation conspiracies of recent years. We view the facts, as we should, most favorably to the position of the Government, Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), United States v. McCarthy, 473 F.2d 300, 302 (2 Cir. 1972), United States v. Tropiano, 418 F.2d 1069, 1074–1075 (2 Cir. 1969), cert. denied 397 U.S. 1021, 90 S.Ct. 1262, 25 L.Ed.2d 530 (1970). One Alfredo Mazza, a salesman for European heroin sources, arranged with one Alfredo Aviles, agent for American buyers, for the importation in July, 1971, of some 80 kilograms of uncut, European heroin, concealed in various parts of a Volvo automobile. The car was dismantled in a Manhattan garage pursuant to arrangements by the appellant Perez. Some 64 kilograms of heroin, the subject of the substantive count, were delivered from the garage to the Aviles apartment. There, appellants

---

* Senior Circuit Judge for the District of Columbia Circuit, sitting by designation pursuant to 28 U.S.C. § 294(d) (1970).

1. And others who were foreign nationals or in fugitive status or were severed from trial.

2. One Louis Fragliossi in other unrelated narcotics violation situations had acted on occasion as an informant for a BNDD group Supervisor, Leonard Vecchione. Originally named as a defendant in the pending indictment, Fragliossi was severed one week prior to the trial.

3. The three shipments of heroin hereinafter to be mentioned totaled approximately 300 kilograms which over the period here involved had a "street" value of more than $68,000,000. See New York State Commission of Investigation, Narcotics Law Enforcement in New York City, 36 (1972). After the trial during a pre-sentence colloquy, Judge Bauman observed that Arroyo had been dealing in heroin at a million dollars a transaction. He continued:
In my extensive experience this is the largest single transaction with which I have ever been confronted.

Arroyo and Gonzalez met with Aviles. Gonzalez tested a portion of the heroin, indeed he carried away a sample for further testing, and thereafter Gonzalez and Arroyo took delivery of some 49 kilograms of heroin and made payment of more than a half million dollars.

Next followed in January, 1972, a second shipment of some 176 kilograms of heroin which, however, was seized in Florida—and so were Mazza, Aviles and Arroyo. Mazza was unable to post bail but Aviles did so for himself and then undertook arrangements for a further consignment of heroin expecting to use a portion of the proceeds of its sale in posting bail for Mazza. While cooperating with Alfredo Mazza's brother Carlos and with Mazza's lawyer, the appellant Ferrer and their European heroin supplier, one Condemine, Aviles found himself named in another narcotics indictment. Aviles presently agreed to introduce an undercover agent,[4] Sergeant Valentine, into the continuing conspiracy. With the plan to free the jailed Mazza still having high priority, Aviles met with Arroyo and one Fragliossi, who agreed to purchase heroin upon the arrival of the expected shipment.

Meanwhile, appellant Ferrer asked for and received a flexible saw to be smuggled to and used by Alfredo Mazza to facilitate his escape if the conspirators should fail to secure his release. At trial, appellant Ferrer, the only one of the accused to testify, admitted receiving the saw but testified that he had never delivered it to the federal prisoner.

In August, 1972 Aviles talked with Gonzalez who expressed interest in obtaining heroin from the expected shipment, and also with the appellant Sanchez. Thereafter, during the course of a taped conversation with Sergeant Valentine alias Guillermo,[5] Sanchez was assured that the shipment[6] of heroin expected from overseas sources was of high purity, and Sanchez agreed to take 30 kilograms of that heroin at a price of $18,000 per kilogram.

II.

The foregoing outline of the Government's case against those on trial is deemed adequate to depict the far-reaching and on-going nature of the crimes charged and of the participation of each of the accused in effectuating its objects. Repeatedly Judge Bauman most carefully instructed the jury that evidence as to each of the charges was to be considered separately in the determination of the guilt or innocence of each participant. He required the jury to indicate by special verdict the degree of involvement, if any, by each of the accused and of the association by each with the objects [7] of the conspiracy if the jury were to find one to exist. The understanding and the discernment of the

---

4. Working thereafter with Aviles was an operative of the Joint Task Force, William Valentine, who posed as one "Guillermo".

5. Sanchez has argued that he could not be convicted of conspiracy with the other codefendants since his arrangements for participation had been made with Aviles and Valentine who, it developed at trial, were acting as agents of the Government. As to that point Judge Bauman instructed the jury:

> However, if you find that these agents acted as connecting links between Sanchez and the Belgian and Argentinian co-conspirators you may find that Sanchez was a member of the conspiracy charged in the indictment * * * I instruct you that Mr. Sanchez can be found guilty of the conspiracy only if he knew and intended to

join those who intended to import and sell heroin as I have charged you.

6. That particular lot of heroin, consisting of 60 kilograms, secreted in bales of sheepskins consigned to a New York City furrier was seized aboard a steamer in Brazilian waters. Government agents there took samples of the heroin which pursuant to stipulation of all counsel, were received in evidence, having been tested by a government chemist and having been found to be 78 per cent pure heroin.

7. Those objects were, as listed in the instructions:
   1. To import heroin;
   2. To distribute heroin;
   3. To assist Alfredo Mazza to escape from prison.

jury are entirely apparent from the verdicts as rendered.[8]

■ It has been asserted, not by Arroyo, but by Perez, Ferrer, Gonzalez and Sanchez that the evidence against each of them was not sufficient to justify submitting their cases to the jury. We reject out of hand any such claim. Compare the facts as narrated in United States v. Barrera, 486 F.2d 333 (2 Cir. 1973). It has become clear beyond peradventure that

> we are not dealing with minor league addicted street pushers but with well-financed brazen professionals engaged in a large-scale criminal undertaking. . . . United States v. Bynum, 485 F.2d 490, 499 (2 Cir. 1973).

■ It has been urged upon us that there was error in the refusal of the trial judge to instruct the jury as to the possibility of multiple conspiracies. Such a claim has received consideration in this court before now, and it has often been recognized especially where heroin is involved, that it would be unrealistic to assume that major producers, importers, wholesalers or retailers do not know that their actions are inextricably linked to a large on-going plan or conspiracy. Only one conspiracy was alleged and proved. United States v. Barrera, *supra*; United States v. Bynum, *supra*, 485 F.2d at 495–496; United States v. Cirillo, 468 F.2d 1233, 1238–1240 (2 Cir. 1972), cert. denied, 410 U.S. 989, 93 S.Ct. 1501, 36 L.Ed.2d 188 (1973); United States v. Calabro, 449 F.2d 885, 891–893 (2 Cir. 1971), cert. denied, 405 U.S. 928, 92 S.Ct. 978, 30 L.Ed.2d 801 (1972); United States v. Nuccio, 373 F.2d 168, 174 n. 4 (2 Cir.) cert. denied, 387 U.S. 906, 87 S.Ct. 1688, 18 L.Ed.2d 623, rehearing denied, 389 U.S. 889, 88 S.Ct. 16, 19 L.Ed.2d 199

(1967). There was no error on this aspect.

We reject, without enumeration, assorted claims of error as to various other rulings running through some two weeks of a well-conducted trial. *See, generally,* our treatment in United States v. Barrera, *supra,* United States v. Bynum, *supra,* United States v. Calabro, *supra,* and United States v. Agueci, 310 F.2d 817 (2 Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1016, 10 L.Ed.2d 12 (1963).

### III.

■ Before the severance from the case of co-conspirator Rodriguez, his counsel in the course of preparation had interviewed Aviles' wife.[9] The conversation was taped. What she then said Aviles had earlier told her became in part the subject of cross-examination of Aviles by respective counsel for Arroyo and Gonzalez. With the trial about to terminate, whether the woman should be brought from Puerto Rico came under discussion.

Arroyo has briefed extensively a claim that what the woman had told Rodriguez's counsel should have been received to demonstrate Aviles' bias and interest. Counsel argued that

> the jury would have regarded Aviles in a wholly different light if presented with testimony that he actually engaged in lawless and illegal conduct directly relating to the case being tried in order to insure favorable treatment by the government. (Brief for Arroyo).

We now explore the pertinent background.

After Aviles in 1972 undertook cooperation with Sergeant Valentine, he dealt with various of the parties on

---

8. The docket entries show the jury's responses to the special verdict requirement concerning *individual participation* in achieving the conspiratorial objects outlined above, note 7:

> As to Arroyo, Nos. 1 and 2 existed; as to Ferrer, objects Nos. 1, 2 and 3 were established; as to Gonzalez, objects Nos. 1

and 2 were proved; as to Perez, only object No. 1 existed; as to Sanchez, the jury found involvement as to objects Nos. 1 and 2. (And see Transcript, 1474, 1475, 1476)

9. She previously had been married to Rodriguez.

trial and with others of the originally indicted defendants. Among the latter were Aviles himself and Ralph Torres and Benjamin Rodriguez as to whom on April 25, 1973, Judge Bauman granted a motion to sever.

Pressed to disclose what promises had been made by the Government in return for his collaboration, Aviles testified there had been no assurances of leniency or of special treatment, and that all he hoped for was that cases outstanding against him would be brought on all at one time and before the same judge. Arroyo's counsel on a different tack presently asked if Aviles in January, 1973 was locked up in Puerto Rico for beating his wife and received a negative reply. Arroyo's counsel put the question "Would you frame someone?", with Aviles answering "Why should I do that?" Counsel replied "To get yourself out from under. That's why."

Counsel for Gonzalez took up cross-examination, particularly with reference to the interview with Aviles' wife taped by counsel for Rodriguez. It was thereupon developed that Aviles knew Torres, Rodriguez and one Alberto Esqui Jarosso. Allowing great latitude, Judge Bauman permitted counsel for Gonzalez to have access to the grand jury testimony of Aviles' wife when the Government investigated possible obstruction of justice. Cross-examination thereafter resulted in testimony by Aviles that he never told the woman that he had framed Rodriguez and Torres, and that he had never told her that he had arranged for Esqui Jarosso to pretend he was Torres and thus to telephone Sergeant Valentine to discuss narcotics with him. When Aviles was asked whether he had while in Puerto Rico struck or harmed his wife in any way, the prosecutor objected and was sustained.

The foregoing background has been supplied in some detail for an understanding of developments after the Government rested its case. Some six weeks after all concerned knew of the taped interview of Aviles' wife, counsel for Gonzalez brought up the possibility of bringing the Aviles woman from Puerto Rico to New York. Extended discussion by the court and counsel concerning a time schedule resulted in a general agreement that the defense would make an effort to ascertain whether or not the Aviles woman would testify that Aviles had tried to frame one of the defendants on trial. As guidance to counsel Judge Bauman commented:

> Now, I want to make this clear to you. If all this woman is going to testify to is about Torres, Rodriquez and Esqui Jarosso, save yourself the money because you have now made an offer of proof and I tell you that I don't regard that as admissible evidence. (Transcript, 1214).

The following morning the judge asked: "What have you got to report?" Counsel for Gonzalez informed the judge that the lady was interviewed "last night"; she will not testify that Aviles framed either Gonzalez or Arroyo or any other defendant on trial, and "there would be no point in producing her, as Your Honor indicated yesterday". (Transcript, 1217).

No exception was noted by Arroyo respecting Judge Bauman's handling of the matter. Gonzalez on brief to this court has not even mentioned the incident. We would have taken no notice of the point had not Judge Bauman, perhaps in an excess of caution, given consideration to the belated claim advanced only on the last day of the trial.

Moreover the trial judge in great detail instructed the jury that in evaluating the testimony of any witness, the jury was to weigh his possible interest and to consider bias or prejudice including all varieties of hostility. Should it be found that a witness had testified falsely, the jury was free to reject all of his testimony or to accept such part of it as might be found to be reliable. Specifically,

> It is for you to decide whether a participant in the crime, such as Aviles

or Mazza, is telling the truth or perjuring himself in the hope of obtaining some concession from the government or the court. (Transcript, 1417).

We are entirely satisfied that no error has been made to appear. *Cf.* United States v. Blackwood, 456 F.2d 526, 529, 530 (2 Cir. 1972).

## IV.

We now turn to what seemed at first blush to have been a point of significant proportions, indeed Judge Bauman felt impelled to conduct in the absence of the jury a series of hearings to ascertain the exact facts. Arroyo and Gonzalez had claimed that the fairness of their trial had been so tainted as to require a dismissal of the indictment on the ground that the Government had initiated an unlawful intrusion upon the confidential relationships between these accused and their counsel. They have here asserted their right to a *per se* rule which would require a reversal of the judgments of conviction without any showing of prejudice on their part.

It turned out that Louis Fragliossi on occasion had served as an informant for Leonard Vecchione who was a group supervisor for the Bureau of Narcotics and Dangerous Drugs. Vecchione had had nothing to do with the development of the instant case which had been worked up under the aegis of Sergeant Valentine of the New York Task Force. Like Gonzalez and Sanchez, Fragliossi had agreed to purchase heroin upon the expected arrival of the heroin, the proceeds of the sale of which were to be used in securing the release on bail of Mazza, in prison in Florida. So it was that the indictment, in part involving that third shipment, named Fragliossi as one of the original defendants. On the face of it, Fragliossi had shared a common interest with Arroyo and Gonzalez.

Fragliossi, called as a witness by counsel for Arroyo, testified that he had been indicted with the others in December, 1972. Arroyo's counsel brought out that Fragliossi had indeed attended with Arroyo and Gonzalez defense strategy discussions. Methods of attacking the credibility of Aviles were planned and a program for conducting investigations of Aviles was under consideration. Fragliossi rejected defense counsel's suggestion that his attorney attend the meetings.

Instead, Fragliossi's attorney disclosed to Assistant United States Attorney Velie that

> his client had been indicted for a crime he did not commit, and explained that Mr. Fragliossi had been an informant during the entire thing and had been indicted by mistake by this other agency. He explained that Mr. Fragliossi had been an informant for the BNDD but had gotten indicted in a Task Force case for acts which he had been carrying out with relation to the BNDD.

Checking with Supervisor Vecchione, Velie learned

> that Vecchione had been working Fragliossi as an informant and had directed certain of his activities, and Mr. Vecchione felt Mr. Fragliossi had been indicted in somebody else's case for the actions he, Vecchione, had authorized.

Mr. Velie further checked with other Assistant United States Attorneys and various Task Force agents who were the "case agents" and in charge of the file and familiar with the facts underlying the instant investigation. Finally satisfied [10] that Fragliossi had been mis-

---

10. It seems clear enough that Mr. Velie was anxious to avoid even a suspicion that Fragliossi could be deemed a "sham" defendant. Undoubtedly he was not unaware of what had been said in United States v. Lusterino, 450 F.2d 572 (2 Cir. 1971) where one Grillo, as a sham defendant, on the stand had confessed to joint guilt with Lusterino. At page 575, *id.*, Judge Smith, writing for the court in reversing the conviction, said

> When the prosecution participates in allowing a false picture to be painted, it bears a heavy burden of showing that it could not have affected the verdict. It has not shown that here.

takenly named as a defendant in the indictment because of acts which Vecchione had authorized, Mr. Velie nolled the case as to Fragliossi.

Under cross-examination by government counsel it was developed that Fragliossi was nevertheless concerned [11] as the record reveals.

Q. You repeatedly spoke, did you not, with Mr. Vecchione asking him how come you have been indicted?

A. Yes.

\* \* \* \* \* \*

Q. Do you recall being instructed by Mr. Vecchione not to reveal at any time anything some defendant may have told you about this case?

A. That is the time when he threw his hands up and said: I don't want to hear nothing more about this.

\* \* \* \* \* \*

Q. You also knew, did you not, that since you had been indicted it might be necessary for the Government to reveal the fact that you had been in contact with an agent?

A. Yes.

Q. You were very upset about that; were you not?

A. Yes.

Q. You pleaded with various government officers numerous times not to reveal that?

A. Yes.

\* \* \* \* \* \*

Q. Did Mr. Vecchione tell you not to tell him what, if anything, was going on on the defense side?

A. Could I say it in my own words?

The Court: Yes.

A. After we discussed it a few times, then he says to me—that is what he said to me: I don't want to hear any more about it, and he threw his hands up.

The foregoing random excerpts from the cross-examination by government counsel culminated in Fragliossi's testimony that he had not discussed any of the matters under inquiry with any other government officer.

Judge Bauman was fully aware [12] of the nature of the problem unfolding before him. Only a month earlier he had been confronted with the claim that any intrusion by the Government into defense strategy, *ipso facto*, "taints the entire prosecution", as he noted in United States v. Cohen, 358 F.Supp. 112, 129 (S.D.N.Y.1973). He there had observed that the Second Circuit does not follow cases which apply a *per se* rule, citing United States v. Mosca, 475 F.2d 1052, 1060–1061 (2 Cir.), cert. denied, 412 U. S. 948, 93 S.Ct. 3003, 37 L.Ed.2d 1001 (1973).[13]

---

11. That Fragliossi had deemed himself suspect for apparent doubledealing seems clear enough; and if indeed he was "upset", it was not without reason, for shortly after the trial Fragliossi was murdered.

12. The trial judge asked whether or not after some five or six meetings at the defense lawyer's office Fragliossi had told Mr. Vecchione what had happened. The witness answered:

Yes, I discussed them, you know, what happened. I discussed my case. I discussed what was going on.

The inquiry continued:

The Court: Did you tell Mr. Vecchione what was being planned between defendants in those five or six meetings?

The Witness: I think I did.

The Court: After about the fifth or sixth meeting Mr. Vecchione said: I don't want to hear anything more about that; is that right?

The Witness: He threw his hands up. He says: I don't want to hear anything more about this.

The Court: Did you, after that occasion, ever discuss with him any other meetings of counsel and defendants?

The Witness: No, I don't remember. I'm not sure, I just asked him about my case, you know.

13. *And see* United States v. Rosner, 485 F.2d 1213, 1224 (2 Cir. 1973):

We conclude, however, that a finding of unlawful intrusion must precede the determination of its consequences. We can make no such finding here. Judge Bauman, after hearing the witnesses, found to the contrary . . . . [W]e are convinced, on our own review of the evidence, that the Government has sustained its contention beyond a reasonable doubt.

Further details were developed in testimony by Vecchione and by Assistant United States Attorney Velie.[14] The defense motion to dismiss was denied. As the record shows, Judge Bauman ruled:

> Now it's denied because I haven't seen the slightest—slightest evidence that would tend to support any poison reaching into the levels of Government at which this prosecution would have resulted in a deprivation of the defendant's [sic] right to counsel.

The judge accepted the word of Group Supervisor Leonard Vecchione,

> that he was not told what Fragliossi heard in the meeting, and certainly therefore, that since he hadn't heard he couldn't have passed it on to anybody important in the prosecution team.

The judge continued:

> I find Mr. Vecchione credible on this subject and I prefer his testimony to that of Mr. Fragliossi as I think almost anyone listening to them would be inclined to do.

After further observations, Judge Bauman specifically took the position:

> At any rate, my conclusion is even assuming all that, there is nothing sufficient in this case to have poisoned the prosecution, and as I have previously indicated, I find as a fact none of it passed on to any member of the prosecution team.[15]

We are satisfied that once the mistaken indictment of Fragliossi was discovered, the Government's representatives took entirely proper steps to insure that the defense would not be compro-mised. We join Judge Bauman in his conclusion that there was no violation of the appellants' Sixth Amendment rights.

Such other miscellaneous claims as have been urged are lacking in merit and require no discussion. We are completely persuaded that the trial was fairly and properly conducted.

The judgments of conviction are in all respects

Affirmed.

---

14. For example, Vecchione directed Fragliossi to keep away from meetings with Arroyo and Gonzalez and their counsel. Government counsel Velie warned Vecchione that if Fragliossi should blurt out anything he might have learned, Vecchione was not to pass along such information to the prosecution. It appears that there was no unlawful intrusion by the Government into defense counsels' conferences, indeed the defense has not alleged prejudice. Moreover, Judge Bauman found that no prejudice had appeared, and we agree. Cf. n. 13, *supra.*

15. Judge Bauman's finding is conclusive. Had privileged information acquired by Fragliossi while a codefendant—or even after the severance—been passed along to the prosecution, a very different problem would have been presented. *Cf.* Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); Santobello v. New York, 404 U.S. 257, 262, 92 S.Ct. 495, 30 L. Ed.2d 427 (1971).