**UNITED STATES of America,**
**Appellee,**

v.

**Ralph SANTANA et al., Appellants.**

**Nos. 1114, 1115 and 1163, Docket Nos. 74–1080, 74–1567 and 74–1460.**

United States Court of Appeals, Second Circuit.

Argued June 21, 1974.

Decided Aug. 19, 1974.

Certiorari Denied Dec. 9, 1974.
See 95 S.Ct. 632.

Albert J. Krieger, New York City (Alan F. Scribner, New York City, of counsel), for appellant Santana.

Irving Anolik, New York City, for appellant Quinones.

Joel A. Brenner, Mineola, N. Y. (Diller & Schmukler, New York City, of counsel), for appellant Rivera.

Jeffrey Harris, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty. S. D. N. Y., S. Andrew Schaffer, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before SMITH and MANSFIELD, Circuit Judges, and BARTELS,* District Judge.

MANSFIELD, Circuit Judge:

In January 1974, following a jury trial before Judge Dudley B. Bonsal in the Southern District of New York, appellants Ralph Santana, Herman Rivera and Horacio Quinones, who were named with numerous others (10 co-defendants and 10 co-conspirators) in an indictment charging them with participation in a far-flung international "French connection" type narcotics conspiracy in violation of 21 U.S.C. §§ 173 and 174, were convicted.[1] Upon this appeal each asserts numerous claims of error. Their convictions are affirmed.

The proof, viewed in the light, most favorable to the Government, reveals the

---

* Of the United States District Court for the Eastern District of New York, sitting by designation.

1. Appellants were sentenced to serve prison terms as follows: Santana, 12 years; Rivera, 5 years; and Quinones, 5 years.

existence for some 3½ years of a continuing conspiracy to purchase large quantities of heroin from suppliers in France, which were smuggled into the United States for sale and distribution here. The core operators were Edouard Rimbaud, a French purveyor of narcotics, and Antonio Flores, an American buyer. Theirs was the continuing relationship from which the acts of the other conspirators derived their meaning and purpose. The Rimbaud-Flores conspiracy began in 1968 when it was formed through the offices of Joseph Lucarotti, a Frenchman then serving a term in the Atlanta Federal Penitentiary ("Atlanta" herein). Lucarotti wrote from the penitentiary to Rimbaud, then in France, informing him that Lucarotti had a buyer for any heroin that Rimbaud might be able to supply. Rimbaud replied that he had a heroin source but no money to make the initial purchase in France. Lucarotti informed Rimbaud that he had an associate whose wife would provide him with $16,000 for this purchase.

The scene then shifted to Montreal. In 1968 Rimbaud arrived there from France and promptly sent a telegram to a New York address that Lucarotti had provided as that of his associate's wife. Several days later Lillian Santana, wife of appellant Ralph Santana, who was a prison-mate of Lucarotti in Atlanta, appeared at the Montreal hotel where Rimbaud was staying. After they discussed the sale she departed and later returned to the hotel with the $16,000 for the purchase of heroin. Equipped with these funds, Rimbaud arranged for the shipment of five kilograms of heroin from France to Montreal. The plan went awry, however, when one of Rimbaud's men, upon arrival at the Montreal airport, was forced to discard the heroin in order to avoid detection. When told of the mishap, Lillian Santana remarked that it would bother her husband. A few days later she arranged a direct meeting in Montreal between Rimbaud and Flores, the purchaser, at which Rimbaud advised Flores to come to France himself to pick up the next shipment of heroin.

Rimbaud returned to France and located more heroin for Flores. Flores then arrived in Paris accompanied by appellant Herman Rivera and one John "Buggy" Brown. Rimbaud, Flores and his companions next travelled to Avignon, France, where the delivery of two kilograms of heroin was made. At this point Flores returned to the United States, leaving to Rivera the task of smuggling the heroin into this country, which he completed successfully with the help of Brown. The heroin was delivered to Flores in New York.

For a period the Rimbaud-Flores arrangement established through Mrs. Santana worked smoothly. In January 1969, for instance, Rimbaud advised Flores in New York that he could ship 20 kilos of heroin from France to Montreal, which Flores agreed to buy at a price of $10,000 per kilo. The heroin was then smuggled into Canada through a courier, Edmund Taillet, who secreted it in musical instruments, and was delivered to Flores in two installments, payment being made by Flores to Rimbaud in Montreal.

Two months later Rimbaud was arrested in New York for his part in an unrelated narcotics transaction and held at the West Street Federal Detention Headquarters ("West Street" herein) in New York. Coincidentally, Flores found himself detained at West Street at the same time. During their sojourn there Flores attempted unsuccessfully to acquire from Rimbaud the name of the latter's French supplier. When Flores was released, he promised Rimbaud that he would send him an attorney. A few days later appellant Horacio Quinones appeared in court and announced that he was representing Rimbaud. During his subsequent interviews with Rimbaud at West Street, Quinones pressed Rimbaud for the name of his French source. Rimbaud consistently refused to divulge his source because he still entertained hopes of raising his bail (fixed at

$75,000) and returning to his own drug operations. As part of his plan to raise his bail money, Rimbaud enlisted the aid of Quinones in smuggling letters in and out of West Street. The letters directed one of Rimbaud's associates in France to smuggle two kilograms of heroin into the United States, secreted inside ski poles. The bail-raising plan collapsed, however, when the police intercepted the ski poles.

With his hopes of bail thus dashed, Rimbaud agreed to reveal the name of his French heroin source to Quinones. Quinones also prevailed upon Rimbaud to raise $7,500 in payment for the "legal" services being rendered by Quinones. (Flores had already paid Quinones $1,000 for taking the Rimbaud case.) Rimbaud told Quinones that an associate in France would pay him the $7,500. Quinones and Flores then traveled to France, Quinones to collect his $7,500, Flores to make his French connection. Thenceforth Flores conducted an extensive heroin smuggling business directly with Rimbaud's suppliers in France, who from 1969 to 1971 made a series of shipments through their courier, Edmund Taillet, to Flores and his successor, Anthony Segura, in New York.

Meanwhile Rimbaud languished in jail and in 1971 was sent to Atlanta to serve his sentence. There he met Ralph Santana, who expressed strong displeasure at Flores' handling of the drug purchases, stating that Flores had failed to pay his wife the $1,000 per kilo which apparently had been agreed upon as a commission for connecting Flores with the French heroin suppliers.

As this synopsis of the evidence suggests, each appellant was charged with a distinct part in furthering the overall conspiracy. Santana's role lay in connecting Flores with Rimbaud and the French suppliers. Rivera participated by smuggling a shipment of heroin that Flores had purchased from Rimbaud. Quinones passed information from Rimbaud to Flores and from Rimbaud to his associate in France. The jury concluded that each of the appellants had thus played a role in the conspiracy.

## DISCUSSION

### Santana's Claims

Santana's principal claim is that there was insufficient evidence to establish his participation in the conspiracy, independent of hearsay evidence admitted pursuant to the co-conspirator exception. See Brown v. United States, 150 U.S. 93, 14 S.Ct. 37, 37 L.Ed. 1010 (1893). The settled rule in this Circuit, see United States v. Geaney, 417 F.2d 1116, 1120 (1969), cert. denied sub nom. Lynch v. United States, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970), is that the jury will be permitted to consider such hearsay only if the trial judge determines that the prosecution has proved the defendant's participation in the conspiracy by a fair preponderance of the evidence independent of co-conspirators' declarations. In this case the judge concluded that the prosecution had carried this burden. We agree.

The process of compartmentalizing hearsay and nonhearsay proof of conspiracy for the purpose of separately weighing the latter can sometimes be a difficult task, even for the experienced trial judge, principally because of the risk that incriminating hearsay may unconsciously influence the court's evaluation of relatively weak non-hearsay. In the present case the hearsay evidence against Santana was indeed strong. Following Lucarotti's letter to Rimbaud to the effect that his associate's wife would deliver the $16,000 needed to commence the drug smuggling operation and the loss of the first shipment jettisoned in Montreal, Mrs. Santana remarked to Rimbaud that *her husband* would be disturbed by this loss. However, the nonhearsay evidence against Santana was scarcely less damaging. First of all, there was persuasive circumstantial proof of Santana's role. At the time when Lucarotti sent the message to Rimbaud that he (Lucarotti) had an as-

sociate in Atlanta whose wife would give Rimbaud $16,000 for the heroin, both Lucarotti and Santana were imprisoned at Atlanta. The appearance of Mrs. Santana shortly thereafter in Montreal with $16,000 for Rimbaud's use provides the basis for a strong inference that the arrangement had been made through her husband, who was acting as a link in the chain connecting Lucarotti and Rimbaud. Coupled with this circumstantial evidence is the direct · admission later made by Santana to Rimbaud, after the latter became a prisoner in Atlanta, complaining that after he and his wife had connected Rimbaud and Flores the latter had failed any longer to make the agreed upon commission payments of $1,000 per kilo to Santana's wife. This admission, which falls outside the proscription of the hearsay rule, would probably be sufficient in itself to establish Santana's participation and that he had a "stake" in the conspiracy. See United States v. Ragland, 375 F.2d 471, 477 (2d Cir. 1967), cert. denied, 390 U.S. 925, 88 S.Ct. 860, 19 L.Ed.2d 987 (1968). When the admission is considered against the background of the circumstantial evidence, including Mrs. Santana's activities, the non-hearsay evidence was clearly sufficient to establish Santana's participation in the conspiracy, independent of any hearsay evidence from co-conspirators. See United States v. Ragland, *supra*; see also United States v. Marrapese, 486 F.2d 918, 921 (2d Cir. 1973), cert. denied, 415 U.S. 994, 94 S.Ct. 1597, 39 L.Ed.2d 891 (1974), and United States v. D'Amato, 493 F.2d 359, 363–364 (2d Cir. 1974).

■ Santana further contends that on the basis of his very limited involvement he has improperly been drawn within the dragnet of a wider conspiracy to which he was not a party. He argues that the evidence establishes at best that he and his wife were involved in the early stages, but that by January 1969 they had been eliminated from the operation as Flores began to deal directly with Rimbaud. We disagree. The evidence warranted a finding that Santana entered the conspiracy with full appreciation that he and Lucarotti were to connect Rimbaud and Flores for the purpose of promoting a *continuing* partnership in the importation and sale of illicit drugs. See United States v. Bynum, 485 F.2d 490, 495–497 (2d Cir. 1973), vacated and remanded on other grounds 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974). The partnership in the importation of such large quantities of heroin would obviously require the coordination of others in a chain of distribution and sale over an indefinite period. This was not a "one-shot" venture. Indeed, Rimbaud testified that Santana's later lament to Rimbaud at Atlanta went to the very fact that after "they" (Santana and his wife) had connected "us" (Rimbaud and Flores), Flores had failed to pay the agreed commission ($1,000 per kilo) to Lillian Santana on each of his subsequent purchases from Rimbaud. Flores' nonpayment of the commissions did not alter Santana's role in the conspiracy. Santana took no steps to withdraw. On the contrary, he still considered himself very much part of the ongoing operation, as his umbrage in Atlanta indicates. He had played his important role by connecting Rimbaud and Flores and he understood that during the period of the operation he and his wife would be paid their stake in the form of continuing commissions, just as would an agent who sold a life insurance policy. The evidence was more than sufficient to establish Santana's seminal but continuing role in the broad, ongoing conspiracy. See United States v. Arroyo, 494 F.2d 1316, 1319 (2d Cir. 1974); United States v. Agueci, 310 F.2d 817, 826–827 (2d Cir. 1962), cert. denied, Guippone v. United States, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963).

*Rivera's Claims*

■ Appellant Rivera pursues a similar vein in his assignment of errors. He argues first that the evidence of his involvement in the importation of two kilograms of heroin was insufficient to constitute him a member in the broader

conspiracy for which he was charged. While we appreciate the dangers that may attend the charge of a multiple conspiracy, none of them is encountered here. Even the most rudimentary models reveal that a narcotics conspiracy of the chain type depends for its success on the employment of a number of persons, each of whom, while appreciating the scope of the overall business venture, performs a separate assigned task and does not necessarily know or work directly with all of the other participants. See United States v. Bynum, *supra*, 485 F.2d at 496–497; United States v. Arroyo, *supra*; United States v. Agueci, *supra*. One need not participate in each act of a conspiracy in order to be a part of it. A single act may suffice, if that act is one from which knowledge of the general conspiracy can be inferred. See United States v. Ramirez, 482 F.2d 807, 816 (2d Cir.)., cert. denied, sub nom. Gomez v. United States, 414 U.S. 1070, 94 S.Ct. 581, 38 L.Ed.2d 475 (1973); United States v. DeNoia, 451 F.2d 979 (2d Cir. 1971); United States v. Aviles, 274 F.2d 179 (2d Cir.), cert. denied, sub nom. Genovese v. United States, 362 U.S. 974, 80 S.Ct. 1059, 4 L.Ed.2d 1010 (1960).

■ Rivera's participation was hardly the neutral or ministerial act of some hapless minion. Rather he had consciously involved himself in an extended episode in importing drugs. See United States v. Ramirez, *supra*. He traveled to France, attended several meetings with Rimbaud, the seller, and Flores, the buyer, and then at Flores' instruction took delivery of two kilograms of heroin, which he smuggled into the United States and delivered to Flores' representatives here. His actions constituted the very essence of the conspiracy charged, which was to buy, sell, and transport narcotic drugs. From the depth of his involvement with Flores and Rimbaud and from his actions themselves, the jury might infer Rivera's knowledge that he was participating in a broad ongoing conspiracy. See United States v. Ramirez, *supra;* United States

v. DeNoia, *supra*; United States v. Aviles, *supra*.

■ Rivera's second point, that the Government's evidence proved multiple conspiracies rather than the single conspiracy charged in the indictment, must fail for the same reasons. The evidence supported the conclusion that he was consciously acting as part of a single large conspiracy. See, e. g., United States v. Agueci, 310 F.2d 817, 826–827 (2d Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963); United States v. Bynum, *supra*, 485 F.2d at 495–497; United States v. Arroyo, *supra*, 494 F.2d at 1319. The district court committed no error when it declined to give a multiple conspiracy instruction to the jury in the terms requested by the defendants. United States v. Arroyo, *supra*. Indeed, even if the evidence had established multiple conspiracies, Rivera could claim no prejudice, for the variance could not have affected his substantial rights. United States v. Calabro, 467 F.2d 973, 983 (2d Cir. 1972), cert. denied, 410 U.S. 926, 93 S.Ct. 1358, 35 L.Ed.2d 587 (1973); United States v. Agueci, 310 F.2d 817, 827 (2d Cir. 1962), cert. denied, 372 U. S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963).

■ Finally, Rivera challenges the court's failure to instruct the jury more specifically on the interest of a co-conspirator or accomplice who testifies for the prosecution. See United States v. Padgent, 432 F.2d 701 (2d Cir. 1970). The principal witnesses against Rivera were Rimbaud and Terry Paul Jones, both of whom had been implicated in the conspiracy and both of whom stood in the shadow of future prosecution at the will of the government. The district court did instruct the jury that the testimony of such co-conspirators and accomplices should be subjected to "close and searching scrutiny," particularly because of their past criminal records. See United States v. Caci, 401 F.2d 664, 672 (2d Cir. 1968), cert. denied, 394 U. S. 917, 89 S.Ct. 1180, 22 L.Ed.2d 450

(1969). Immediately preceding this admonition, the court had given an "interested-witness" charge, instructing the jury to decide whether a witness had an interest in the case. The defense counsel for their own part had during cross-examination and summation vigorously advanced their contention that these co-conspirators were testifying in an effort to improve their lot with the prosecutor and government.

It must be recognized that no talismanic formula has been prescribed as the caution to be given to a jury regarding accomplice testimony. Much turns on the evidence in each case. In the setting here, although the better course would have been for the trial judge to caution the jury to scrutinize the testimony of accomplices in terms of their possible motivations rather than simply their records and activities, we think that the issue of the co-conspirators' interest was "fairly put to the jury," United States v. Blackwood, 456 F.2d 526, 531 (2d Cir.), cert. denied, 409 U.S. 863, 93 S.Ct. 154, 34 L.Ed.2d 110 (1972), and that the court's instruction on accomplice and co-conspirator testimony was sufficient for that purpose. See United States v. Ploof, 464 F.2d 116 (2d Cir.), cert. denied sub nom. Godin v. United States, 409 U.S. 952, 93 S.Ct. 298, 34 L.Ed.2d 224 (1972); United States v. Cataldo, 433 F.2d 38, 41 (2d Cir. 1970), cert. denied, 401 U.S. 977, 91 S.Ct. 1200, 28 L.Ed.2d 326 (1971), reh. denied, 402 U.S. 934, 91 S.Ct. 1523, 28 L.E.2d 869 (1971); United States v. Falange, 426 F.2d 930, 933 (2d Cir.), cert. denied, 400 U.S. 906, 91 S.Ct. 149, 27 L.Ed.2d 144 (1970).

### Quinones' Claims

Like the other appellants, Quinones argues that the evidence was insufficient to link him to the conspiracy. We disagree. Quinones had been chosen by Flores to act nominally as legal counsel for Rimbaud. In fact, however, he did not limit himself to the performance of legal services. Indeed his efforts were devoted for the most part to unlawful efforts to carry out the conspiracy. From the outset, using his access as attorney to see his client Rimbaud at West Street, where Rimbaud was held, he sought to extract from Rimbaud the name of his French source so that Flores might continue the drug operation despite Rimbaud's incarceration. When Rimbaud, hoping to gain release on bail, balked at making the disclosure, Quinones agreed to assist him in an attempt to raise bail money by smuggling letters in and out of West Street for Rimbaud. The letters, apparently written in French but unsealed, were used to hatch and implement a plan for smuggling heroin into the United States in ski poles, with the proceeds from the sale of the heroin to be used to furnish bail money for Rimbaud.

Quinones argues that it was reversible error to have admitted the prejudicial testimony concerning the "ski pole" incident because it was an independent, irrelevant operation, not part of the conspiracy charged in the indictment. However, his counsel objected to the proof belatedly and then withdrew the objection insofar as it might be based on the claim that the ski-pole incident was not in furtherance of the conspiracy, which precludes review here. United States v. Indiviglio, 352 F.2d 276 (2d Cir. 1965) (en banc). Even assuming that the issue is reviewable, Judge Bonsal adequately protected Quinones against prejudice by instructing the jury that the "ski pole incident is not part of the conspiracy in this indictment and please don't consider the testimony about the ski poles in determining the guilt or innocence of any of these defendants." Furthermore, this instruction was overly generous. The evidence of the ski-pole incident was relevant to the conspiracy since it represented an attempt by Rimbaud to gain his freedom so that he could resume his active role as a participant. The jury was entitled to infer from all the circumstances that Quinones was assisting him with knowledge of his unlawful purpose and in furtherance of the conspiracy. See United

States v. Arroyo, 494 F.2d 1316 (2d Cir. March 22, 1974), where, in a remarkably parallel situation, evidence of efforts to finance the release of a jailed co-conspirator, some by his lawyer who was later named as a defendant in the indictment charging a large scale narcotics conspiracy, by arranging an importation of heroin, was held admissible on the ground that such activities were in furtherance of the broad narcotics conspiracy alleged.

The ski-pole incident was also relevant to explain Rimbaud's subsequent decision to reveal his French source to Quinones. Only because his plan of raising bail money had been foiled by the Government's seizure of the ski poles did Rimbaud agree to give Quinones the information that he and Flores sought. Rimbaud then gave Quinones an unsealed letter of introduction to his French associate, Jean Dieupart, directing Dieupart to connect Flores with the French supplier, provided Flores would agree to pay a 5% commission to Rimbaud on subsequent transactions. At the same time Quinones told Rimbaud that his legal fee would be $8,500 and that Flores had already paid $1,000 toward it. Rimbaud discussed the contents of the letter with Quinones, assuring him that Dieupart would pay him the remainder of his fee. Quinones and Flores then went to France and upon his return Quinones notified Rimbaud that Flores had made his connection with the French source. The entire background of Quinones' smuggling of letters was thus probative of his guilty knowledge and intent.

Against this background of personal involvement, Quinones' argument that there was insufficient evidence to link him to the conspiracy borders on the frivolous. Quinones' participation, albeit belated, was crucial to the continuation of the single narcotics conspiracy charged in the indictment. Through Quinones Flores made direct contact with the French supplier and guaranteed the continued life of the operation in the face of Rimbaud's imprisonment.

Quinones alternatively claims that Rimbaud's version of their conversations in West Street was inadmissible hearsay because on several occasions he and Rimbaud had required the services of an interpreter, Christian Hysohion, who was a prisoner at West Street and Rimbaud's erstwhile cohort in crime, see United States v. Hysohion, 439 F.2d 274 (2d Cir. 1971). One-third to two-thirds of Rimbaud's conversations with Quinones were direct and in broken English. Rimbaud's first-hand testimony as to this portion of these conspiratorial conversations is beyond any hearsay challenge. As for that part of the conversation in which Hysohion acted as translator, he functioned as an agent for the two co-conspirators, Rimbaud and Quinones, which rendered admissible Rimbaud's testimony regarding statements made by Hysohion as an agent for Quinones.

The real concern here is less the hearsay nature of the Rimbaud testimony than it is the reliability of the Hysohion translation. See United States v. Tijerina, 412 F.2d 661, 664 (10th Cir.), cert. denied, 396 U.S. 990, 90 S.Ct. 478, 24 L.Ed.2d 452 (1969). We have, however, no reason to distrust the translation. No motive has been shown on the part of Hysohion to mislead either Rimbaud or Quinones. More importantly, as an external indicium of reliability attaching to the Hysohion translation, the actions that followed these conversations were entirely consistent with the content of the conversations as translated. Cf. United States v. Puco, 476 F.2d 1099, 1102–1105 (2d Cir.), cert. denied, 414 U.S. 844, 94 S.Ct. 106, 38 L.Ed.2d 82 (1973). We thus think it was proper to admit Rimbaud's testimony regarding these translated conversations. See United States v. Tijerina, *supra*.

As a final point Quinones objects to the use of certain admissions he made on the occasion of a visit to the United States Attorney's office. Quinones had been subpoenaed to appear before a grand jury investigating a narcotics case. He arrived too late to ap-

pear before the grand jury and went instead to the office of the Assistant United States Attorney handling the case. There he pressed the Assistant to tell him the reason for the subpoena. The Assistant advised him that he did not have to say anything and that he might be indicted on the matter then pending before the grand jury. Quinones insisted that he was anxious to cooperate. The Assistant then asked him whether he knew that it was a crime to smuggle letters from West Street and whether he had in fact smuggled any letters from there. Quinones replied that he had. After being fully advised of his rights, Quinones answered further questions concerning his role in the Flores case. At trial on the conspiracy charge the prosecution introduced these admissions in evidence against Quinones.

At a pretrial suppression hearing the Government disclosed that Quinones was already under a sealed indictment for the present conspiracy at the time he made these admissions to the Assistant United States Attorney.[2] Quinones now objects that he was lulled into making an admission by the prosecutor's failure to advise him that he was already under indictment. The prosecutor replies that he did not disclose the indictment to Quinones because none of the other members of the conspiracy named in the indictment had yet been arrested on the bench warrants issued for their arrest and that to reveal the existence of the indictment might jeopardize the Government's chances of locating them.

Quinones could hardly have been lulled into making his admissions. Compare Spano v. New York, 360 U.S. 315, 79 S. Ct. 1202, 3 L.Ed.2d 1265 (1959). He knew that the United States Attorney was investigating his role in the drug operation; he was warned that he might be indicted in the pending narcotics case; finally, he was advised that he need make no statements, a warning that Quinones as an attorney experi-

enced in the practice of criminal law must have appreciated and fully understood. Quinones nonetheless chose to admit his role in smuggling letters, apparently because he thought that his admission would lend credibility to his denial of knowledge of the contents of the letters and thus avoid being implicated in the narcotics offense. Thus he was not lulled into admitting his part in smuggling letters from a federal prison, itself a felony offense (18 U.S.C. § 1791). Rather he made the admission in a calculated effort to exculpate himself from the more serious narcotics charge under consideration, which would probably carry a mandatory minimum prison term if he should be indicted and found guilty. Given Quinones' awareness of the situation, we think the failure to disclose the sealed indictment did not materially affect his admissions. The evidence was thus properly admitted against him.

We find all other points raised by appellants to be without merit. The judgments of the district court are affirmed.

---

2. On October 25, 1972, a sealed indictment charging 16 defendants, including Quinones, with a conspiracy to import drugs was issued. Quinones made his admission to the Assistant United States Attorney on December 22, 1972. In 1973 two superseding indictments were issued. The latter of these formed the basis for the present case.